**No. 24-1462**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA,

Appellee,

v.

WALTER GLENN PRIMROSE,

Defendant-Appellant.

On Appeal From the United States District Court
for the District of Hawaii
Crim. No. 22-00060 LEK-01

# SUPPLEMENTAL EXCERPTS OF RECORD FOR APPELLEE
# VOLUME 1 OF 4

KENNETH M. SORRENSON
*Acting United States Attorney*
*District of Hawaii*

THOMAS MUEHLECK
*Assistant U.S. Attorney*
*Room 6-100*
*PJKK Federal Building*
*300 Ala Moana Blvd.*
*Honolulu, Hawaii 96850*
*Telephone: (808) 541-2850*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 22-00060 LEK |
| | ) | |
| Plaintiff, | ) | Honolulu, Hawaii |
| | ) | March 6, 2024 |
| vs. | ) | |
| | ) | |
| WALTER GLENN PRIMROSE, (01) | ) | SENTENCING |
| aka "Bobby Edward FORT" | ) | |
| | ) | |
| Defendant. | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE LESLIE E. KOBAYASHI
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Government: | THOMAS MUEHLECK, AUSA<br>Office of the United States Attorney<br>PJKK Federal Building<br>300 Ala Moana Boulevard, Suite 6100<br>Honolulu, Hawaii 96850 |
| Also Present: | NATE MEYERS, FBI Special Agent<br>JUSTIN JO, U.S. Probation Officer |
| For the Defendant Walter Glenn Primrose *also known as* Bobby Edward Fort: | WALTER GLENN PRIMROSE<br>12619-122<br>FDC Honolulu<br>Inmate Mail/Parcels<br>P.O. BOX 30080<br>Honolulu, Hawaii 96820<br>*Pro Se* |
| Standby Counsel: | GARY GURMAIL SINGH, ESQ.<br>Topa Financial Center<br>Bishop street Tower<br>700 Bishop Street, Suite 2000<br>Honolulu, Hawaii 96813 |

APPEARANCES CONTINUED:

Official Court Reporter: Debra Read, RDR
United States District Court
300 Ala Moana Boulevard
Honolulu, Hawaii 96850
readit3949@gmail.com

Proceedings recorded by machine shorthand, transcript produced with computer-aided transcription (CAT).

WEDNESDAY, MARCH 6, 2024 1:32 P.M.

THE COURTROOM MANAGER: Criminal No. 22-00060-1, United States of America versus Walter Glenn Primrose, also known as Bobby Fort.

The matter is set for a sentencing as to Counts 1, 2, 3, and 5 of the superseding indictment.

Counsel, please make your appearances for the record.

MR. MUEHLECK: Good afternoon, Your Honor.

Tom Muehleck for the United States. With me is FBI Special Agent Nate Meyers.

THE COURT: All right. Good afternoon to you both.

The record will also reflect from United States Probation Office Mr. Jo. Good afternoon to you.

Mr. Singh and Mr. Fort -- actually I should start with Mr. Fort.

THE DEFENDANT: Good day, Your Honor.

This is Bobby Edward Fort, aka Walter Glenn Primrose, my Standby Counsel Mr. Gary Singh.

THE COURT: All right, sir. Good afternoon to both of you.

All right. So, Mr. Fort, you filed a motion to post a bond and to be released on bail pending your appeal. I mean, you haven't filed your appeal yet because you have to be sentenced.

The problem with determining your bail conditions, even

my ability to impose it, is that that has to be done before your sentencing because I think once I sentence you, you're no longer going to be in Marshals' custody; you're going to be in the Bureau of Prisons', and so I won't be able to change your conditions on that. So we have to determine that before you got sentenced.

Mr. Muehleck really hasn't had an opportunity to respond, and Pretrial Services has given me a report. They're not recommending your release. Part of the reason why is we can't really evaluate what you're proposing because other than Global Positioning Satellite, we're really -- like, where you going to live, what kind of, you know, restrictions. You don't qualify for clean and sober house because you've never had substance abuse issue. We don't have a halfway house here anymore.

So I'm not quite sure -- and, you know, sort of a short notice, so probation hasn't looked at different considerations and you haven't proposed any. So that's where we're at a quandary.

So without anything other than being suggested that you post a bond and that you have GPS, there really aren't conditions that I would approve any kind of release because of the concern that, you know, in the past you've been able to obtain identities and obtain government IDs, et cetera. There's a risk of flight that Pretrial Services has pointed out and I think the government has argued in the past.

So what do you want to do? If you want me to address the release issue, you're going to need to come up with a plan, Pretrial Services is going to have to have an opportunity to review the plan, like where you would live, how you'd support yourself, you know, could GPS be a reasonable way of keeping track of you. And then, of course, Mr. Muehleck will have to have an opportunity to look over it and see if he opposes it and the reasons for his opposition, which means we would put off your sentencing.

Or, we can go forward today on your motion as is, which Pretrial Services is recommending against. I could deny it and then we could go forward with the sentencing.

What would you like to do?

THE DEFENDANT: Yes, thank you, Your Honor, for even addressing it. I thought I would bring it today because this is probably the last times I will be before the Court, so I would put it on the record.

My wife and I do intend on retiring here. That was the plan 25 years ago and it still stands. It's our home in Kapolei, that's where we'll retire.

Yes, our sentencing more than likely will be a lot less than the usual riffraff -- I'm sorry to put it that way -- of the island. So it will not be an extreme incarceration.

I would also like to bring -- I did not see it in the presentencing report -- but the 1(b)(1)(11) which is the

compassionate release also. I realize it's a little -- a little earlier the prison is supposed to put that in, but this is the opportunity for the defendant to do that. Also, I thought I would bring that up. Yes, that would be a little farther along, but I do want to put that on the record also, just simply put it on the record.

But it is our home, it is our homestead, it's been so for 20-some odd years, and that is where we'll retire, so that's the thing.

Yes, we do have this name business and that will have to be taken care of, but we do have a little time. I would just like to put that on the record.

But that was it essentially, yes, Your Honor. I just want it on the record to see what -- what could be done, and I understand.

THE COURT: Okay. So you want to -- I take from that two things. One is that you want me to rule now as opposed to later on your motion for release on bond, now before your sentencing?

THE DEFENDANT: No, Your Honor, that's fine. I'll withdraw that motion, if you wish. I just simply wanted it on the record to see how the -- what pretrial -- what the probation office had to say. I realize that this was an opportune time to put it on the record. It will be more difficult later on for me.

I would beseech you to kind of help me along here. Yes, I'm still pro se --

THE COURT: Right, right. So what I'm saying is, is that if I rule on it today --

THE DEFENDANT: Yes.

THE COURT: -- and then go forward with sentencing, you know, I would deny the motion --

THE DEFENDANT: Okay.

THE COURT: -- and then go forward with sentencing because probation has recommended against it. Your motion doesn't indicate anything that would address the risk of nonappearance and danger to the community.

So do you want to do that, or do you want to postpone your sentencing and give Mr. Muehleck an opportunity to respond and also for you to come forward with a plan?

THE DEFENDANT: No, we'll not postpone sentencing. We're all here already. That's fine.

THE COURT: Okay.

THE DEFENDANT: And I realize that. I think just me putting on the record GPS monitor will probably take care of everything. We have home here, it's not going anywhere. I think the FBI probably did an excellent job in our background search. There aren't any other assets anywhere else. There's nowhere else to go. Government has all of our identification, not going anywhere.

So, not employable. They have all of our identification, so we're kind of stuck here.

But I can withdraw the motion. It's not a -- I don't know if that's the word you put it, withdraw the motion for --

THE COURT: So withdraw the motion means as if you hadn't ever filed it. Do you want me to do that or do you want me to rule on the motion?

THE DEFENDANT: Go ahead and rule on the motion, yes, Your Honor, that's fine, that's fine, if you do not mind. Thank you.

THE COURT: Okay. So with regard to the defendant's motion that was filed on I think February 28th -- that's your withdrawal. There was another motion that was filed seeking leave to --

MR. MUEHLECK: March 1st, Your Honor, I believe.

THE COURT: Yeah.

MR. MUEHLECK: Standby Counsel submission bail pending appeal March 1st, Your Honor, ECF 339.

THE COURT: Yes. Thank you very much.

MR. MUEHLECK: Yes, Your Honor.

THE COURT: So I've heard argument with regard to same. I've received Pretrial Services' updated report recommending against release, and therefore, I find that based on looking at all of the submissions that there is no condition or combination of conditions that can address both danger to

the community as well as the risk of nonappearance, and therefore, your motion is denied.

Now, you also referred to a motion for compassionate release. None has been filed. I would argue it's premature.

MR. MUEHLECK: Yeah.

THE COURT: But you're pro se, so I want to make sure that I give you a liberal construction as to what you are alleging. Are you just mentioning that or are you making an oral motion for compassionate release?

THE DEFENDANT: I didn't follow that, I'm sorry, again. I may have to ask the --

THE COURT: Oh, do you need a hearing --

THE DEFENDANT: Yes, please. I'm sorry.

THE COURT: Yeah, hearing assist, yes.

Ms. Elkington, do we have any? Yeah. Thank you.

THE DEFENDANT: My apologies. I'm trying to follow as well as I can.

THE COURT: No, no, we provided you with that before.

THE DEFENDANT: Thank you, ma'am.

THE COURT: All right. So I just denied your motion for release on bond.

THE DEFENDANT: Yes, Your Honor.

THE COURT: So in your argument you talked about a motion for compassionate release.

THE DEFENDANT: Yes, Your Honor.

THE COURT: I don't believe you filed one. I also believe that you really don't have the right to file one 'cause you haven't been sentenced yet.

But are you making an oral motion for compassionate release at this time or were you just mentioning it?

THE DEFENDANT: No, Your Honor. If that is a sequence, we need to sentence first and then do an oral motion for compassionate release, yes, Your Honor, that's what I would like to do.

THE COURT: Well, I'm not encouraging an oral motion because, you know, Mr. Muehleck has to have an opportunity to respond to it. So --

MR. MUEHLECK: I can respond at this point, Your Honor, if the Court -- whatever the Court wants.

THE COURT: Yeah.

MR. MUEHLECK: I think it's -- he hasn't been sentenced yet, so he's not in a sentence situation, and that's what 3582 talks about.

There are no exceptional reasons that he's listed at this point that I'm aware of. The bail has been denied. You know, there's no clear -- as far as the bail being denied, I didn't see that he presented any clear and convincing evidence that he was not likely to flee or not a danger to society.

And as far as the compassionate release orally, I don't

believe the statute applies, and he certainly hasn't given any exceptional circumstances and he hasn't submitted it to the warden either, the proposed -- the proposed release on compassionate release. There has to be a plan, it has to be submitted to the warden for the warden's first call on this. So this is -- this is not applicable, our position.

THE COURT: Right. So it is premature. He hasn't, you know, exhausted his administrative remedies and so forth, so I'm denying it without prejudice. Also, he has to be sentenced first.

With regard to your reference to clear and convincing evidence, I think his burden is not clear and convincing but preponderance.

MR. MUEHLECK: Okay.

THE COURT: Yeah. I mean, 'cause usually you --

MR. MUEHLECK: Very well, Your Honor.

THE COURT: -- charge people with drug trafficking and that is clear and -- but I find that even under preponderance there isn't -- there's nothing to satisfy the condition that it protect against fleeing and the danger of the community.

Okay. So with that clarification, both those matters have been addressed. So now we're going to turn to sentencing.

So this is your sentencing hearing. At your hearing, Mr. Fort, I'm going to make certain findings. I'm going to

then state what I believe to be the aggravating and mitigating factors in your case, and then I'm going to turn to Mr. Muehleck and then yourself, since you're representing yourself, for your folks' position on what is a reasonable sentence for you and an appropriate sentence. And an appropriate sentence under the law is one that is sufficient but not greater than necessary to meet the goals of sentencing, which include just punishment for the harm you've committed to our community, to give you -- to deter you and others from committing these sorts of crimes, and then also to give you an opportunity for rehabilitation.

Let me first ask you have you had a full and fair opportunity to read, review, and discuss the presentence report and any addendum and file any factual or legal objections to the report? Have you had this opportunity?

THE DEFENDANT: Yes, Your Honor, I have.

THE COURT: All right. Thank you. You may be seated.

The court makes the following findings: From October 24, 2023, to October 30, 2023, you appeared for a jury trial, and on October 30, 2023, you were adjudged guilty as to Counts 1, 2, 3, and 5 of the superseding indictment charging you with:

Count 1, conspiracy to make false statements to a governmental agency;

County 2, aggravated identity theft;

Count 3, false statements in application and use of passport; and,

Count 5, conspiracy to make false statements and application of use of passport,

All in violation of federal law.

I now place the presentence report in the record under seal. If an appeal is taken, counsel and of course Mr. Fort will have access to all of the report.

You had a co-defendant, your wife, and she was found -- adjudged guilty as to Counts 1, 2, 4, and 5 of the superseding indictment and she is pending sentencing.

All right. So, Mr. Muehleck, the government has no remaining objections to either the factual findings or the application of the guidelines to the facts; is this correct? Or --

MR. MUEHLECK: We do not have any objections, Your Honor.

THE COURT: All right. Thank you.

And then, Mr. Fort, you had filed several objections to the presentence report, and as a result there was an addendum to the presentence report that appears at page 19 and goes on through and including page 21 that was filed by probation.

Do you have any -- now that they've responded to your objections, do you have any continuing objections to what you've raised?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. Let's go over them.

THE DEFENDANT: Let's see if I can find my one piece of paper.

Your Honor, on the presentencing addendum, I wish to be designated to FDC Honolulu and the secondary would be Terminal Island. I did not see that on the presentencing report.

That was on my -- the --

THE COURT: Right. So that wouldn't be something that I would take into account on the presentence report. So let's just start at page 19.

Do you have the presentence report?

THE DEFENDANT: Yeah. Yes, Your Honor.

THE COURT: All right. So each of the objections that you set forth in your sentencing statement filed on January 27, 2024, probation has taken each of those and responded to it.

Are you satisfied with all of the responses that probation has filed? Do you accept them?

THE DEFENDANT: Stand by, Your Honor, I have just the draft. I need to see the -- I do not have the presentencing report in front of me.

MR. MUEHLECK: Mr. Singh, are you missing one? I can ask the Court to make a copy of mine.

THE COURT: Just a moment. They're saying just a

moment.

THE DEFENDANT: If we can look at it, Your Honor, we can give it back to the government after this.

THE COURT: Thank you, Mr. Muehleck.

MR. MUEHLECK: Yes, Your Honor.

THE DEFENDANT: Okay. We're on page 19, Your Honor.

THE COURT: Correct. So maybe it'd be easier if we do this. I'm going to go through each of them and I'm going to rule on it.

THE DEFENDANT: Yes, Your Honor.

THE COURT: If we get to one and you're withdrawing your objection, you let me know.

THE DEFENDANT: Yes, Your Honor. Thank you.

THE COURT: So on page 19, first you objected because you state your legal name and age and general information are not representative of your true identity.

The court resolves the objection in favor of sustaining how the response was with regard to probation; that's based on official records, and no change should be made to the face sheet.

With regard to paragraphs 2, 3, 5 through 8, 12, 14, through 20, 22, 24 through 28 and 30 through 40, you submitted that the paragraphs contain incorrect facts, statements, and identifying data for the defendant and co-defendant and maintains that the U.S. District Court does not have

jurisdiction over the instant case. Additionally, you state you did not provide any materially false information as Bobby Fort.

The court rules on the objection as follows: It finds that the appropriate information is correct as indicated in probation's response, that the legal history and summary of the investigative materials were correctly provided, and therefore, no changes will be made.

As to paragraph 53, you note that the correct name is Julie Lyn Montague, and the response was the paragraph has been amended to correct the typographical errors. So that correction has been made.

Paragraph 54, you represent that you and Morrison have lived at your residence more than 22 years and have homestead exception with the City and County.

Probation's response is that your representation was incorporated in the filing of the sentencing statement, therefore, there is no longer any objection.

Paragraph 55 you represent you and Morrison are planning to retire at your residence in Kapolei.

Probation responded that it incorporated that information -- that you incorporated that representation by the filing of your sentencing statement. The court rules that there's no need to change the presentence report.

Paragraph 57 you represent two medical conditions, that

you have prostate cancer and sleep apnea for which the government refuses to release information.

Response by probation is that your representation is incorporated by the filing of your sentencing statement. The court accepts that and finds that probation is unable to independently verify that, but your representation is made known for the record, and therefore, no change to the presentence report is necessary.

Paragraph 60 you represent that you earned your degrees at Hawaii Pacific University.

Probation has amended paragraph 60 to reflect that information based on your representation. So no change -- further change is needed.

Paragraph 62 you represent that Walter Glenn Primrose has no asset, bank accounts, credit card, properties, or income, and that you've been prevented from obtaining a power of attorney.

The response by probation is that your assets and liabilities have accurately been summarized from your report during pretrial investigation, and check of property records did not reflect foreclosure of the 91-1019 property. As such, no changes have been made to the paragraph. The court concludes and resolves your objection is that no changes need to be made to the paragraph.

Paragraph 78 you submit your age, medical conditions,

lack of any violent history, et cetera, warrant a departure or variance.

The response of probation is they have amended paragraph 78 to reflect your request. Therefore, there's no action needed by the government -- or by the court with regard to your objection.

Part F you object on the proposed special conditions as well as the standard conditions of release due to constitutional grounds and due to some being unclear.

The response by probation is that the standard and special conditions reflect standardized language used across the nation, and as such no amendments have been made. The court resolves the objection in favor of the conditions being proposed. Your objections are generalized and they don't provide a basis in which the court can make a determination that they're unconstitutional or otherwise impermissible.

All right. So there we are. We've gone through all of the objections. Therefore, the court finds and accepts the factual bases as set forth in the presentence report as amended by the addendum.

Okay.

THE PROBATION OFFICER: Excuse me, Your Honor.

THE COURT: Yes.

THE PROBATION OFFICER: I don't know if this is a good time to address it, but may I address one small

typographical error on page 22 as well?

THE COURT: Yes, please.

THE PROBATION OFFICER: So within the supervised release row, under the Recommended Sentence column, it should be noted as 3 years as to Counts 1, 3, and 5. I believe that's --

THE COURT: Oh, right. It says 4 and that was to do with his wife.

THE PROBATION OFFICER: That's correct, Your Honor, that's co-defendant's counts.

THE COURT: Okay. Thank you so much. I appreciate the clarification and the record will so reflect.

All right. So based on all of the information submitted to the court, the court determines the applicable guidelines are total offense level 12 -- do you have your hand up?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Oh, yes?

THE DEFENDANT: I'm sorry. I do have a question. I -- I -- and the Court, as far as I know, is going to have to make the determination of this. But Walter Glenn Primrose honestly doesn't -- hasn't signed any of the papers, like any of the paperwork for how much the assets are. The probation office says that this -- these assets do indeed exist; however, I'm being prevented by the government in order to -- to use these assets in any manner whatsoever.

So I have cross purposes here and I am beseeching the Court to tell me what to do.

THE COURT: I can't give you legal advice and you -- you know, you have not wanted to have an attorney appointed for you. You want to represent yourself.

THE DEFENDANT: Yes.

THE COURT: So you're going to have to determine that for yourself or determine if you want to hire a lawyer to advise you how to access the assets.

THE DEFENDANT: In order to -- excuse me -- to access the assets, I have been trying to get a true -- according to the Court -- a true name change through the State Department of State -- the State of Hawaii. I tried yesterday and they didn't bring me the right paperwork.

So that is the avenue that I'm using. And then once I can do that, then I can the access the property for the probation department. But I would like to --

THE COURT: I don't know if you can, but I can't give you any legal advice. You're going to have to seek the advice of an attorney with regard to that.

THE DEFENDANT: Okay. So the -- the Court will not be conferring -- will not determine what -- how that -- how I'm able to do that; is that correct?

THE COURT: Well, so you had filed a motion with the court --

THE DEFENDANT: Yes.

THE COURT: -- and I had ruled on that, that you wanted your -- you wanted for BOP purposes --

THE DEFENDANT: Yes.

THE COURT: -- that your real name be reflected as --

THE DEFENDANT: Dual named, yes.

THE COURT: Right. And so, you know, as I pointed out in the record, for you to have a legal name change, you need to go through the State of Hawaii.

THE DEFENDANT: Yes, and I'm investigating that, yes. Thank you, Your Honor.

THE COURT: Right. And what I had indicated for Bureau of Prisons' purposes is that you -- the whole -- how you were charged in this case can be reflected, so it would be under both names.

THE DEFENDANT: Okay.

THE COURT: Yeah. So I'm not quite sure what you're asking me right now. For purposes of your sentencing, your assets, I guess, for --

THE DEFENDANT: Yes --

THE COURT: -- for the purposes of a fine would be relevant.

THE DEFENDANT: Yes.

THE COURT: But what is it you're asking me? I

can't give you legal advice on how to access these assets or how to do the name change. We just pointed out what the Hawaii statute provides when you want to change your name.

THE DEFENDANT: Okay. Thank you, Your Honor. Thank you for addressing that.

For example -- I'll bring an example. A fine -- I've seen in the paperwork there could be a $5,000 fine. Walter Glenn Primrose does not own $5,000. Now, Bobby Edward Fort may possibly. I'm not sure 'cause I don't know what the bank accounts are.

If I were to sign a check under Bobby Edward Fort, the prosecution could say that that is an illegal function. I'm -- I'm -- I'm illegally signing a check under the wrong name. I have a catch-22.

THE COURT: Well, then you're going to have to seek legal counsel with regard to that, and that's why it's not a good idea for you to represent yourself pro se.

THE DEFENDANT: Okay. That's fine. I understand, yes. Thank you, Your Honor.

THE COURT: Okay. All right. So as I've indicated, the applicable guidelines are:

Total offense level 12;

Criminal History Category I;

This gives a guideline range of imprisonment of 10 to 16 months as to Counts 1 and 2; and as to Count 2, there's a

mandatory two years' imprisonment to be served consecutively to Counts 1, 3, and 4; and as to Count 3, the guideline range is 10 to 16 months;

Supervised release three years as to Counts 1, 3, and 4, and as to Count 2, one year;

Fine plus cost of imprisonment and supervised release guideline range is $5,500 to 55 --

THE COURTROOM MANAGER: 5, Your Honor, not 4.

THE COURT: Did I say 4?

MR. MUEHLECK: You said 4, Your Honor. I think that's a mistake.

THE COURT: I'm sorry. Counts 3 and 4 supervised release of three years, Count 2 up to one year.

THE PROBATION OFFICER: I apologize --

THE COURT: Did I say 4 again?

THE PROBATION OFFICER: -- it's 1, 3, and 5.

THE COURT: And 5.

MR. MUEHLECK: 1, 3, and 5.

THE COURT: I don't know why I keep saying 4. I thought -- okay. All right. Let me do this over again.

Supervised release as to Counts 1, 3, and 5, three years, guideline range; Count 2, the statutory maximum is up to one year supervised release;

Fine plus cost of imprisonment/supervised release $5,500 to $55,000 as to Counts 1, 2, 3, and 5;

Special assessment of $100 per count for a total of $400 as to Counts 1, 2, 3, and 5.

All right. So these are the factors the court sees in aggravation and in mitigation. In aggravation, I first look at the nature and circumstances of the offenses to which you've been found guilty. They essentially boil down to identification theft and misusing your position in terms of getting -- using the ID theft to get government-issued identification.

In aggravation, the length of the deception from 1987 to your arrest, a period of over 30 years, so this is a long period of deception.

You enlisted in the armed forces with a false identification.

You obtained security clearance while in employment with armed forces with your false identity.

You obtained government identification, such as passports and a driver's license, with false identification as well as social security number.

You obtained false identification and government identification for your wife.

Identification theft is one of the growing, you know, horrors of living in the modern world. It's used for all sorts of bad acts. You yourself when you testified at trial made it a point saying you didn't want to say how you did this because

you knew that it would open the door to, you know, a boatload of bad actors using whatever you did to obtain the identification of two other people for yourself and for your wife or two dead children for yourself and for your wife because you know that it would open the door to a lot of criminal activity.

You did it solely for personal gain. You had a lot of debts, you were in trouble, and you needed to create a new life for yourself and your wife. Rather than leaving and going to a different state or a different country, you decided to take the identities of these two deceased children, and, you know, created emotional harm and emotional, you know, distress by the survivors of these young children. And they came to court and testified about a lot of memories and difficulties as a result of you and your wife taking on these identities and using their names for your own benefit.

You've shown a complete lack of remorse or responsibility for the harm that you've created for your own personal benefit.

There are factors in mitigation. You have no prior criminal convictions. You have a lot of education and have had a successful career. You have great financial assets and as well as a home. You have no history of substance abuse. You have no history of mental health counseling.

As I mentioned, you have the financial means to support yourself without being a burden on society. Your offense is

nonviolent and you have no history of violence.

So those are the factors the court sees in both aggravation and in mitigation.

I'll turn to Mr. Muehleck. What's the government's position?

MR. MUEHLECK: Your Honor, may I raise a point here? I'm not sure where the Court is getting to this. The defendant has filed a motion through counsel -- through the standby counsel to introduce evidence during sentencing, two documents which is a -- his text as Department of Health Certificate of Birth, that's Exhibit B, and Exhibit A is a Social Security card of Gwynn D. Primrose. I expect he's going to refer to these -- the defendant will refer to these during sentencing.

The Court hasn't mentioned these at this point. I have that paper motion if the Court doesn't have it in front of you.

THE COURT: No, I -- so, okay.

MR. MUEHLECK: May I offer that, Judge --

THE COURT: Yeah, okay.

MR. MUEHLECK: -- for the Court's review to see where the Court wants to talk about that?

I -- the United States doesn't have any objection to the Court -- the defendant submitting these for whatever purpose he wants during this sentencing hearing.

THE COURT: Okay.

MR. MUEHLECK: We haven't talked about that yet and

I just wanted to bring that to the Court's attention.

As far as if this is the point where the government will -- to propose a appropriate sentence, Your Honor, I'm ready to be heard.

THE COURT: All right. Please.

MR. MUEHLECK: Thank you.

Your Honor, the Court's sort of hit the nail on the head in the last couple sentences it gave, that the United States sees this as a -- in the Court's consideration of the factor -- the sentencing factors under 3553(a) of Title 18, there's a complete lack of contrition and remorse here, total.

The defendant continues -- refuses to admit that he's made false statements, taken someone else's identity, and continues to make those false statements.

In his objections that was filed to the draft presentence report that Mr. Singh filed for him, on page 4 of the defendant's objections, he talks about "The defendant states truthfully that he is Bobby Edward Fort." Twice he says that. He continues to say that in his -- in his motion and his -- for name change, in his motion for reconsideration the Court's order denying the name change.

This -- as the Court understands, of course, there were two conspiracy counts here, conspiracy in Count 1 and a conspiracy in Count 5 the defendant was convicted of.

Count 5 is the 35-year conspiracy to -- to make false

statements in order to obtain passports and then to use those passports for other purposes, to get drivers' licenses and to travel internationally and to verify eligibility for employment, 35 years. The defendants, with his wife, this was concerted action.

They in Texas in a very short period of time got the birth certificates of Bobby Edward Fort and Julie Lyn Montague. And the defendant by his own testimony said he -- or he -- or I guess it was the co-defendant's testimony, Morrison's testimony, said that she was handed the birth certificate and said, "Here. This is who you are now."

And they -- they used those birth certificates to get driver's license and a Texas ID cards and to get passports and social security numbers and to get passports in North Carolina several years later on the same day in the same courthouse in North Carolina, and then to get extensions on those passports in Hawaii in 2006.

This is one of the longest conspiracies the United States is aware of. So the United States submits to the Court that the bottom end of the guideline range of 10 months is inappropriate and provides no deterrence to the defendant or to the public.

The top range of the guideline is 16 months. So 16 months with a 24 months mandatory as to Count 2, the aggravated identity fraud is 40 months. But the United States

asks the Court to vary upward 6 months and to impose a sentence of 46 months. Thank you. And a fine of $6500, not 5500. 6500 because this should not be at the bottom of the guideline range for fines. Thank you.

THE COURT: All right. Thank you.

Okay. Mr. Fort? So, Mr. Fort, you're representing yourself pro se. You also have the right as the defendant, a right of what's called allocution. All right. So that's separate and apart from your right to represent yourself.

But what I'd like to do is do it all in one, yeah. If -- so rather than you have -- this is what I would say as an attorney, this is what I'd say on my own behalf. Okay?

THE DEFENDANT: Okay. Thank you, Your Honor. Thank you very much.

Not quite sure where to start here. Let's pick Mr. Muehleck's first -- first thing which was the birth certificate and the ID card. I knew that in the trial this was not something that was relevant so I did not bring this out, but my wife and I actually brought it out independently. Remember that we said that when the identities -- when the -- when the names were taken, we personified those names. We became those individuals.

THE COURT: So, you know, I understand that, but that's not a defense, all right? That's not a defense. You both recognized that you were born with different names. You

were not born with the names that you have conducted your lives with, and that's what the case was about, not that you truly believe that's the person that's how you've lived your life. That can be what you think, but that has nothing to do with the offense which you've been convicted, nothing to do with that.

THE DEFENDANT: It's part of my religion.

THE COURT: It has nothing to do with the offense. You can't raise it as a defense. Your religion may be, you know, that you want to rename yourself as a certain name. This was not a nickname. This was not something that you had gone to a court or to an attorney general of some state and said, "You know what? I don't want to be known as Primrose anymore. I want to be known as this name."

No. What happened and what was established in this court, which you have not denied, is that for your own personal benefit, somehow you got the name of these dead children and you and your wife took these identities so that it would protect you from the harm that potentially would be generated by the debts that you owed for your business. Fair enough, okay? But that doesn't permit you to do that legally.

And then you believe that you became these people. That's fine, too. I have a niece who was born with a totally different name, but since day one for whatever reason her parents have decided to call her by her nickname. But when she goes and signs for a passport or something, she doesn't use her

nickname. She uses her legal name. There's a difference.

So I understand that you want to stand here and tell me, "I really am -- feel in the core of my being that I am, you know, Bobby Fort." That's fine, but has nothing to do with why you're in federal court and you've been convicted. And it has nothing to do with I need to take into account -- no matter how sincere that belief is, I can't take that into account in sentencing you. You've committed a crime.

So I look at sentencing factors that indicate will you do this in the future, right? Recidivism? And your lack of remorse, your lack of acceptance of the offense to which you've been -- offenses that you've been convicted makes me very concerned that you will do this in the future because you don't have any respect for the law, and the law requires all of us to use our legal names, not assume the identity of someone else. And if we want to change our names, God knows there're a lot of people who don't like the names their parents or whoever gave them, then you go to the attorney general of the State of Hawaii, if you're from Hawaii, and you ask for a name change, and that's given to all your creditors and it's published in a paper and everybody is supposed to be given notice of that.

Okay. That's not what happened here. So I appreciate that you sincerely believe that you are Bobby Fort, but it has no place -- respectfully, has no place in the sentencing.

All right. So if there's something else you want to

present to me on sentencing and what you think is an appropriate sentence for yourself, you can. If you want to appeal your conviction because you feel you have a legal or factual basis or there's something -- ruling I did during the trial, you can, but that's not the place now in sentencing. That's for your appeal before the Ninth Circuit.

THE DEFENDANT: Yes, Your Honor. I will be appealing this.

THE COURT: I understand. But if there's something you'd like to address with regard to, you know, the sentencing guidelines, what the argument that the government's made as to what's an appropriate sentence, I'm happy to hear that. I'm just not going to hear about matters that have no legal or factual relevance to the issues before us.

THE DEFENDANT: Your Honor, I have a case in front of me.

THE COURT: Okay.

THE DEFENDANT: The case is *United States v. Wasman.* Mr. Wasman had -- he was a businessman and he wanted to have a -- a business deal with some Arabs in the Middle East and those Arabs in the Middle East were very anti-Semitic. Mr. Wasman was Jewish, but he needed to meet them. So his secretary, Mrs. Bucci, B-u-c-c-i, told him, "You need to just change your name." And he did that.

He went to the passport office, says, "I need to go to

the Middle East. My name's Mr. Hendrick," and he gave them a birth certificate and he gave them the ID and some money, said, "Oh, I don't have any ID with me. Ms. Bucci -- my secretary over here, Ms. Bucci, will take care of identifying me." So he got a passport.

But guess what? Title 18, 1542, they found out and he was convicted -- convicted for passport fraud. The -- sounds almost the same thing like our case. He went to appeals and appeals said it was overturned.

THE COURT: And that may be something that you want to bring up, you know, on your appeal. But for now it has nothing to do with your sentencing. You've been convicted. You've been convicted. I mean, it may have some relevance if you want to say I should remain on bail pending appeal because of the likelihood of my success on appeal. That's a whole different thing.

But what we're talking about here is what's an appropriate sentence for offenses which you have never accepted responsibility. It sounds like what your basis is going to be on appeal is that you are not responsible for these offenses. You've shown no remorse because I think your position is you have no responsibility and you shouldn't have been convicted. Fair enough. Okay?

But is there anything that you want to bring up with regard to the sentencing guidelines or anything that the court

should take into account in fashioning a sentence?

THE DEFENDANT: No, Your Honor. I am Bobby Edward Fort and I will not be signing any document saying Walter Glenn Primrose. That's my position. That's -- that's part of me. These were -- rings were taken away from my wife and I when we were arrested.

My father -- that's why I brought this in -- was a minister, if you will check on line 12, not just a run-of-the-mill. He had a doctorate in theology. I have a strong background of religion. As my wife and I said during the trial, it's our embodiment.

We did not hurt the children. We had a gun pointed at us and I got out of that rather than beating up somebody or killing somebody. I think it was very unique. Mr. Wasman, all he had to do was say, "Oh, I did this because I'm Jewish and I didn't want to be" -- well, that doesn't seem like that --

THE COURT: Well, and it may be something you can bring with regard to the conviction. But I would just point out, you pointed out to me your birth certificate. That's the name you were born with and you've never denied that, that you were not born with the name of Bobby Edward Fort, and that you have never denied the fact that or presented any evidence that you ever tried to legally change your name --

THE DEFENDANT: I tried again yesterday -- I tried again yesterday, Your Honor, and they did not --

THE COURT: Well, I mean, I'm talking about before the trial.

THE DEFENDANT: Okay.

THE COURT: I'm talking about before the trial, any time in life, you know, that that was your legal name.

THE DEFENDANT: Yes.

THE COURT: What you're going to do after this has no bearing on the sentencing.

Okay. Is there anything else that you want me to take into account before fashioning your sentence?

THE DEFENDANT: I have two things I would like to mention, Your Honor. Again, it does not have to do with sentencing, but I would like it on the record, please.

Probation office, I would like to make sure that my wife's name is on -- is authorized to put on the presentencing report so I'm able --

THE COURT: You can't speak for her. You can't speak for her.

THE DEFENDANT: I need to be able to talk to her. I need her on my PSR. I need her name at the bottom of my PSR in order --

THE COURT: Wait --

THE DEFENDANT: There are two ways for me --

THE COURT: Well, you can file a motion with regard to that, but right now we're dealing with your sentencing. So

I need to deal with fashioning your sentence. So do you have anything else that has to do with your sentence?

THE DEFENDANT: No, Your Honor.

THE COURT: Okay. You may be seated then.

THE DEFENDANT: Thank you.

THE COURT: Based on the mitigating and aggravating factors, the court determines that the appropriate sentence is:

You are committed to the custody of the Bureau of Prisons for a term of 10 months as to Counts 1, 3, and 5 concurrently, 24 months as to Count 2 consecutively to all other counts;

Supervised release three years as to Counts 1, 3, and 5 concurrently, one year as to Count 2.

I don't think that has to be consecutive, right?

Oh, yeah, all to run concurrently;

A fine of $6,500;

Special assessment of 100 for each count for a total of $400.

Now, Mr. Fort, you were previously provided in writing with the 13 standard conditions of release as part of the initial presentence report in this case. Probation had told you that they're recommending all 13 standard conditions. Do you waive reading of those 13 conditions at this time?

THE DEFENDANT: No, Your Honor. I would like them.

THE COURT: Okay. All right. Do you have the 13 conditions?

THE PROBATION OFFICER: I do, Your Honor. Just one moment.

THE COURT: Thank you.

1. You must report to the probation officer in the federal judicial district where you are authorized to reside within 72 hours of the time released unless probation instructs you to report to a different probation office -- you need to stand.

THE DEFENDANT: I'm sorry, Your Honor. I'm sorry. Thank you.

THE COURT: -- probation office or within a different time frame.

2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer on how and when to report to the probation officer and you must report to the probation officer as instructed.

3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation office.

4. You must answer truthfully the questions asked by the probation officer. Your legitimate invocation of the Fifth Amendment privilege against self-incrimination in response to probation's question -- probation officer's question shall not be considered a violation of this condition.

5. You must live at a place approved by the probation

officer. If you plan to change where you live or who lives with you, you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of being aware of a change or expected change.

6. You must allow the probation officer to visit you at any time reasonable under the circumstances at your home or elsewhere and you must permit, to the extent you are able or authorized to do so, the probation officer to take any items prohibited by the conditions of your supervision that the officer observes in plain view.

7. You must work full-time at least 30 hours per week at a lawful type of employment unless the probation officer excuses you from doing so. If you do not have full-time employment, you must try to find full-time employment unless the probation officer excuses you from doing so. If you plan to change where you work or if there is substantial changes to your job responsibilities, you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8. Unless you have received advance permission from the probation officer or association is required by supervision conditions, you must not voluntarily, intentionally associate with any person you know is engaged in committing a federal, state, or local crime, not including traffic offenses, whether the crime is being committed in or outside your presence.

If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

If you are arrested or questioned by a law enforcement officer, you must notify the probation officer with 72 hours.

10. You must not own, possess, or have access to a firearm, ammunition, destructive device as defined in 18 U.S.C., Section 921(a)(4), or a dangerous weapon, that is, anything that was designed or modified for the specific purpose of causing bodily injury or death to another person such as nunchakus or Tasers.

11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting permission of the court.

12. If the probation officer determines that you pose a risk to an organization or a person relating to your criminal history or personal history or characteristics, the probation officer may require, with the Court's approval, that you notify that organization or person or that person's parent, guardian,

caretaker, or other individual responsible for the person's welfare about the risk, and you must comply with that instruction. The probation officer may contact the organization or person that you are directed to notify and confirm that you notified that organization or person about the risk. And,

13. You must follow the instructions of the probation officer related to the conditions of supervision.

Mr. Jo, with regard to No. 8, no association with anyone convicted of a felony, I'm going to include "except his wife."

THE PROBATION OFFICER: Understood, Your Honor.

THE COURT: Yeah, okay.

THE DEFENDANT: Thank you, Your Honor.

THE COURT: So you can have an association, yeah.

So you must abide by the mandatory and standard condition of supervision including the following:

You must refrain from any unlawful -- well, I'm going to waive the drug testing 'cause he's no history of it for decades.

You must cooperate in the collection of DNA as directed by probation.

You must report to the probation office in the federal judicial district where you're authorized to reside within 72 hours of the time released unless probation instructs you to report to a different probation office or within a different

time frame.

You must abide by the following special conditions:

The fine of $6,500 is due immediately. Any unpaid balance is to be paid during the period of supervision in monthly installments of ten percent of your gross monthly income commencing 30 days after the start of supervision. The court may order that this requirement be changed from time to time as your circumstances warrant, but no court order shall be required for your voluntary agreement to pay more than the court-ordered amount. Interest is waived while you're serving a term of imprisonment and shall begin accruing on any remaining balances commencing 30 days after the start of supervision. Payments must be made by payroll deduction when applicable. You must notify the probation officer of any change in your financial circumstances that affect your ability to pay. Your financial circumstances must be reviewed by the probation officer on at least an annual basis.

You must provide the probation officer access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with U.S. Attorney's Office.

You must apply all monies received from income tax refunds, lottery winnings, inheritance, judgments, and any anticipated or unexpected financial gains to the outstanding court-ordered financial obligation, at the discretion and

direction of the court.

You must not incur new credit charges, or open additional lines of credit, or apply for any loans without the prior approval of the probation officer. You must not borrow money or take personal loans from any individual without the prior approval of the probation officer.

You must relinquish to the Probation Office forms of identification and documents bearing the names and identifying information of other individuals, as directed by the Probation Office.

You must not use or possess any mail, bank-related information, or any other personal identification documents or information that is not legally issued to you.

You must use your true legal name, identifying information, and personal mailing address for any and all purposes.

You must submit your person, property, house, residence, vehicle, papers, or office to a search conducted by a United States Probation Officer. Failure to submit to a search may be grounds for revocation of release. You must warn any other occupants that the premises may be subject to searches pursuant to this condition. The probation officer may conduct a search under this condition only when reasonable suspicion exists that you have violated a condition of supervision and that the areas to be searched contain evidence of this violation. Any search

must be conducted at a reasonable time and in a reasonable manner.

Before I impose the sentence as stated, any legal objections by the government?

MR. MUEHLECK: Not by the government, Your Honor.

THE COURT: All right. Mr. Fort, any legal objections?

THE DEFENDANT: No, Your Honor.

THE COURT: All right. Imposed as stated.

All right. You do have the right to file an appeal, Mr. Fort. You do have a deadline to file that appeal. That deadline is 14 days after your judgment is filed. If you should file after those 14 days, you could be found to be too late or waived or given up your right to appeal.

Do you understand this?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. It's my understanding that you want me to recommend to the Bureau of Prisons designation to -- your first choice is FDC-Honolulu.

THE DEFENDANT: Yes, Your Honor.

THE COURT: And your second choice is Terminal Island.

THE DEFENDANT: Yes, Your Honor. Thank you.

THE COURT: All right. So the Court is going to make recommendations to Bureau of Prisons FDC-Honolulu and

second FCI Terminal Island.

All right. Are there any other matters that we need to address on behalf of the government?

MR. MUEHLECK: Not -- not by the government. Thank you, Your Honor.

THE COURT: Right. And then I know -- you made -- Mr. Jo, anything else that --

THE PROBATION OFFICER: Nothing else, Your Honor.

THE COURT: All right. So I know you've made your motion to withdraw as standby counsel for purposes of the appeal that Mr. Fort has indicated that he wants to file; is that correct?

MR. SINGH: That is correct, Your Honor.

THE COURT: I don't think there's any objection.

MR. MUEHLECK: No. No objection, Your Honor.

THE COURT: All right. Thank you.

So then the court grants your motion, and I will refer to the magistrate judge appointment of -- well, actually, once you file your appeal, right? You can't file an appeal yet.

THE DEFENDANT: Yes, Your Honor.

THE COURT: But once you file your appeal -- trying to think. Once you file your appeal, then usually what happens is you're going to have to ask the Ninth Circuit for an attorney. And you won't be representing yourself pro se on the appeal?

THE DEFENDANT: Your Honor, I can be pro se until I get the attorney. That way I can file the appeal myself.

THE COURT: Well, I mean, Mr. Singh can assist you --

THE DEFENDANT: Oh, okay.

THE COURT: -- in doing that as his last acts.

THE DEFENDANT: Last act.

THE COURT: He's just saying that he doesn't handle the appeals and things like that. But you proceeded pro se, in general.

So I'm not going to appoint an attorney 'cause he's indicated he wants to proceed pro se, and I would just direct as standby counsel that you assist him in the actual filing of the notice of appeal once the judgment is filed.

MR. SINGH: Understood, Your Honor.

THE COURT: All right. Other than that, once the notice of appeal is filed, then you're discharged of your obligations as standby counsel.

MR. SINGH: Thank you.

THE COURT: Okay. I think that's it.

Is there anything else, Mr. Fort?

THE DEFENDANT: No, Your Honor.

THE COURT: All right. And then we'll return this to Mr. Muehleck. Thank you very much --

MR. MUEHLECK: Yes, Your Honor.

THE COURT: -- for this document. Appreciate it.

All right. So you're remanded back to the custody of the U.S. Marshals Service and we stand in recess. Good day, everyone.

(Proceedings concluded at 2:31 P.M.)

COURT REPORTER'S CERTIFICATE

I, DEBRA READ, Official Court Reporter, United States District Court, District of Hawai'i, do hereby certify that pursuant to 28 U.S.C. §753 the foregoing is a complete, true, and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

DATED at Honolulu, Hawai'i, March 6, 2024.

*/s/ Debra Read*

DEBRA READ, CSR CRR RMR RDR

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 22-00060 LEK |
| | ) | |
| Plaintiff, | ) | Honolulu, Hawaii |
| | ) | October 24, 2023 |
| vs. | ) | |
| | ) | |
| WALTER GLENN PRIMROSE, (01) | ) | JURY TRIAL - DAY 1 |
| aka "Bobby Edward FORT" | ) | |
| | ) | |
| GWYNN DARLE MORRISON, (02) | ) | |
| aka "Julie Lyn MONTAGUE" | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE LESLIE E. KOBAYASHI
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Government: | THOMAS MUEHLECK, AUSA<br>Office of the United States Attorney<br>PJKK Federal Building<br>300 Ala Moana Boulevard, Suite 6100<br>Honolulu, Hawaii 96850 |
| Also Present: | DENNIS THOMAS, Special Agent<br>KARI ANN SHERMAN, Paralegal |
| For the Defendant Walter Glenn Primrose *also known as* Bobby Edward Fort: | WALTER GLENN PRIMROSE<br>12619-122<br>FDC Honolulu<br>Federal Detention Center<br>Inmate Mail/Parcels<br>P.O. BOX 30080<br>Honolulu, Hawaii 96820<br>*Pro Se* |
| Standby Counsel: | GARY GURMAIL SINGH, ESQ.<br>Topa Financial Center<br>Bishop street Tower<br>700 Bishop Street, Suite 2000<br>Honolulu, Hawaii 96813 |

APPEARANCES CONTINUED:

| | |
|---|---|
| For the Defendant Gwynn Darle Morrison *also known as* Julie Lyn Montague: | GWYNN DARLE MORRISON<br>12618-122<br>FDC Honolulu<br>Federal Detention Center<br>Inmate Mail/Parcels<br>P.O. BOX 30080<br>Honolulu, Hawaii 96820<br>*Pro Se* |
| Standby Counsel: | MEGAN K. KAU, ESQ.<br>MK Law LLC<br>820 Mililani Street, Suite 701<br>Honolulu, Hawaii 96813 |
| Official Court Reporter: | Debra Read, RDR<br>United States District Court<br>300 Ala Moana Boulevard<br>Honolulu, Hawaii 96850<br>readit3949@gmail.com |

Proceedings recorded by machine shorthand, transcript produced with computer-aided transcription (CAT).

# I N D E X

## CHRONOLOGICAL INDEX OF WITNESSES


| GOVERNMENT'S WITNESSES | PAGE |
|---|---|
| **TONDA ANN MONTAGUE FERGUSON** | |
| Direct Examination By Mr. Muehleck | 45 |
| Cross-Examination By Mr. Primrose | 60 |
| **DINA BOWERS** | |
| Direct Examination By Mr. Muehleck | 62 |
| Cross-Examination By Mr. Primrose | 80 |
| Cross-Examination By Ms. Morrison | 82 |
| Redirect Examination By Mr. Muehleck | 83 |
| **PAYTON GARBARINO** | |
| Direct Examination By Mr. Muehleck | 88 |
| Cross-Examination By Mr. Primrose | 125 |
| Cross-Examination By Ms. Morrison | 128 |
| **SCOTT JUSTIN STALLA** | |
| Direct Examination By Mr. Muehleck | 129 |
| Cross-Examination By Mr. Primrose | 137 |
| Cross-Examination By Ms. Morrison | 144 |
| **LACEY DINGMAN** | |
| Direct Examination By Mr. Muehleck | 149 |
| Cross-Examination By Mr. Primrose | 155 |
| **SHAWN GRAY** | |
| Direct Examination By Mr. Muehleck | 158 |
| Cross-Examination By Mr. Primrose | 162 |

# I N D E X

## E X H I B I T S



| NO. | FOR EVIDENCE PG. |
|---|---|
| 1 | 52 |
| 2 | 54 |
| 3 | 55 |
| 6 | 150 |
| 6.1 | 133 |
| 6.2 | 134 |
| 6.3 | 134 |
| 6.4 | 135 |
| 7 | 95 |
| 8 | 107 |
| 9 | 112 |
| 10 | 86 |
| 11 | 87 |
| 12 | 120 |
| 14 | 123 |
| 15 | 124 |
| 20 | 124 |
| 30 | 72 |
| 93 | 64 |
| 117.2 | 76 |
| 117.4 | 77 |
| 117.6 | 78 |
| 117.7 | 78 |
| 117.8 | 79 |
| 136 | 85 |
| 143 | 167 |
| 151.1 | 57 |

until the jury appears.

MR. MUEHLECK: Your Honor, may I from here?

THE COURT: Yes, you may.

MR. MUEHLECK: Thank you.

(A recess was taken.)

(Open court with the jury:)

THE COURT: The record will reflect the presence of the ladies and gentlemen of the jury, welcome back, as well as counsel, Mr. Fort, and Ms. Montague. The witness is on the stand.

Please call your first witness.

MR. MUEHLECK: Tonda Ferguson first, Your Honor.

THE COURT: Please administer the oath.

THE COURTROOM MANAGER: Thank you, Your Honor.

**TONDA ANN MONTAGUE FERGUSON, GOVERNMENT'S WITNESS, WAS SWORN**

THE COURTROOM MANAGER: Thank you. Please be seated.

If you would state your full name and spell your last name for the record.

THE WITNESS: It's Tonda Ann Montague Ferguson. The last name is F-e-r-g-u-s-o-n.

THE COURT: Your witness.

MR. MUEHLECK: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MUEHLECK:

Q Ms. Ferguson, are you employed?
A I'm retired.
Q What was your job before -- what was your employment before you retired?
A I worked for Southwest Airlines.
Q And what did you do with them?
A I worked in the corporate office and I did communications.
Q Okay. And for how long?
A 38 years.
Q Where were you working out of?
A Dallas, Texas.
Q Do you know a Julie M. -- Julie L. Montague?
A Yes.
Q How do you know Julie L. Montague?
A She was my infant sister.
Q Let me ask you, can you recall about your -- where you were when your -- where you were living when your infant sister was born?
A Yes. My family -- I had -- it was my sister, Debbie, who's three years younger than me, and we were living in Burnet, Texas, and my mom was pregnant. I remember going to the hospital, and my grandmother, who was my mother's mother, we called her Big Mama -- Big Mama had come to be with us. And mom went to the hospital and we were in the -- we all went to

the hospital, actually, and my sister and I stayed in the waiting room.

Q All right. Let me ask you a couple of questions here.

You said your sister's -- this was a younger sister?

A Yes.

Q And her name?

A Debbie.

Q All right. And your mother's name?

A We called her Dodi.

Q Okay. What was her full name?

A Doraline.

Q Okay. And her maiden name?

A Casey.

Q C- -- Casey --

A C-a-s-e-y.

Q Okay. And your father, what was his name?

A John Harvey Montague.

Q And what did your father do for a living?

A He worked for the United States Department of Agriculture.

Q In a office building somewhere, or was he field or what?

A Yes, he was in a office building in Burnet.

Q And what was his position there?

A He was the County Executive Director. He helped the farmers get loans and when they needed to plant crops and things.

Q All right. Let me ask you, Ms. Ferguson, about the feeling you had when you knew you were going to have a sibling, your mother was -- your mom was pregnant?

A We were overjoyed.

Q Okay. And your grandmother came to assist?

A Yes.

Q All right. And take us to the day of the birth of your -- Julie Montague, if you will, the hospital.

A We were living in a very small town. It's a relatively small town, and we all just went to the hospital. I remember being a very, very cold day, and my sister and I, we waited in this waiting room with my grandmother, and my dad was off with -- with mom or wherever he was, and I had -- at some point I guess my grandmother left and then she came back.

I remember my grandmother was the one to come tell my sister and I that our little sister, once she was born, she had a lot of birth defects and they knew that she was not going to live. And so I remember my grandmother coming to tell my sister and I that.

And then later on, I'll never forget the image of my father walking down the hall to come to be with my sister and I to tell us that.

Q Did you stay at the hospital a long time?
A I don't think we did. After that I know my father did, but I'm pretty sure -- I don't -- I don't have total recollection of that, but I know my mom was in the hospital for several days after that and --
Q I'm sorry. Did you see Julie Lyn Montague, the baby?
A No, we were not allowed to see her. When she was born, they knew that due to her birth defects that she would not live, and so we were not allowed to see her.
Q Do you remember the day of her birth?
A Oh, absolutely.
Q Do you remember the date of her birth?
A Oh, the date? Yes.
Q What was the date?
A January the 7th, 1968.
Q How long did Julie Lyn Montague -- before that, did you have a task to perform when you got home with your father?
A I did. My mom was in the hospital for a few days and I was in eighth grade, so this is why I have very clear recollection of everything because I was older. And when I -- when we were home and my father was there, he -- it was real important to him, he wanted to try to ease what pain he could for my mother, and so dad and I took the nursery down. We had the nursery all ready. And so we took the nursery down

and packed away all of the clothes and, you know, packed everything away to -- so mom wouldn't have to come home and see that.

Q How long did Julie Lyn Montague, your sister, live?

A Three weeks.

Q How did you get the news?

A So it was a tough three weeks and my dad had instructed the doctor -- well, they didn't know how long she would live. It could have been two days or whatever. And it ended up being three -- three long weeks. And my dad had instructed the doctor that when he called -- when he called the house, to make sure that he asked for my father.

And I was the one who answered the phone and I remember my mom, she was sitting under a hair dryer. It was the old-fashioned hair dryers with the plastic so she couldn't quite hear. But she saw me answer the phone and she could tell from my face that she knew, you know, that it was the doctor. And they asked for my father, and I went and got dad, and so then dad, you know, told us all.

Q Was there a service for Julie Lyn Montague?

A Yes. Because she lived, she lived for three weeks, and so yes, we had to have a funeral for her.

Q Where was the funeral?

A It was in Burnet -- Burnet, Texas, where she was born.

Q And do you recall the doctor's name that attended your mother?
A Yes. His name was Dr. Ray Shepperd and knew him well because it's a very small town and it was those small town doctors that did everything. And he had done my knee surgery, he delivered by baby sister, Julie, so yes, we knew him well.
Q Where was the memorial, the service for Julie Lyn Montague?
A It was in Burnet. I don't know if they had more than one funeral home or not, but I remember it was at Clements Funeral Home and --
Q Clements?
A Clements.
Q Okay. And did you go to the service?
A Oh, absolutely.
Q Let me ask you how did your father take this death of Julie Lyn Montague?
A It was -- it was hard on all of us, and I think as every good father would do, he tried to be strong. And -- but I'll never forget him walking down the hall and grabbing my sister and I and hugging us in the hospital when we found out the news.
And then at the funeral, I distinctively remember after the gravesite and so many people coming up and my father breaking down in tears, and I think that that was the first

time I'd ever really seen my father be that emotional and crying.

MR. MUEHLECK: Your Honor, we'd like to admit an exhibit, Exhibit No. 1.

THE COURT: All right. Any objection?

MR. PRIMROSE: No objections, Your Honor.

MS. MORRISON: No, Your Honor.

THE COURT: All right. It's received. Would you like to publish?

MR. MUEHLECK: We would like to publish, Your Honor, please.

THE COURT: You may.

(Exhibit 1 received into evidence.)

THE COURT: So there is a large screen in front of you and so if anybody can't see the screen, let us know. There's also a screen to the right of you if that's easier. Okay.

MR. MUEHLECK: Let me -- continue, Your Honor?

THE COURT: You may, please.

Q (BY MR. MUEHLECK:) Yes. Do you recognize any of this information in Exhibit 1, Ms. Ferguson?

A Yes. It's my sister's birth certificate.

Q And it says Shepperd Memorial Hospital. Was that the hospital?

A Yes.

Q All right. And there's a street address. Do you recognize the street address to the right, which is 2D, I guess?

A The one that says 701 North Romberg?

Q Yes.

A Yes. That was our home address.

Q Your home address?

A Yes.

Q Okay. And then the block 7?

A Yes, my sister's name.

Q Is that your -- okay. That's -- I think that's block 3, and then block 5 is the sex, and then block 7 below that?

A Block 7 is my mother and father's name and that's my father's signature.

Q And -- all right. And County Office Manager is your father's occupation?

A Yes.

Q And your mother's name -- maiden name is Doraline Casey?

A Yes.

MR. MUEHLECK: All right. You can take that off. Thank you.

And we'd like to offer exhibit -- oh, introduce Exhibit 2, Your Honor.

THE COURT: All right. Any objection?
MR. PRIMROSE: No objection, Your Honor.
MS. MORRISON: No, Your Honor.
THE COURT: All right. Received. Do you wish to publish?
MR. MUEHLECK: Wish to publish, Your Honor, please.
THE COURT: All right. You can.
(Exhibit 2 received into evidence.)
Q (BY MR. MUEHLECK:) This is the death certificate for Julie Lyn Montague, Ms. Ferguson?
A Yes, it is.
Q And the bottom -- the bottom -- yeah, the bottom section -- thanks, Kari.
All right. Funeral director and signature, Clements Funeral Home, Howard Clements, they handled the funeral?
A Yes.
Q And interment was where?
A At the cemetery in Burnet, Texas.
Q How -- how small was Burnet at that time or how big, I should say?
A I think it was around 3,000 residents, I'm not positive. I know it was very small, one hospital, yeah.
MR. MUEHLECK: Could we look at Exhibit 3, please?
Offer Exhibit 3, Your Honor?
THE COURT: All right. Any objection, Mr. Fort?

MR. PRIMROSE: No objection, Your Honor.
THE COURT: Ms. Montague?
MS. MORRISON: No objection.
THE COURT: Received. Do you wish to publish?
MR. MUEHLECK: Yes, please, Your Honor.
(Exhibit 3 received into evidence.)
THE COURT: All right. You may.
Q (BY MR. MUEHLECK:) Did you go to the cemetery, Ms. Ferguson?
A Yes, many times.
Q Can you identify Exhibit 3?
A Yes. That's the grave marker at my sister's grave.
Q In Burnet City Cemetery?
A Yes.
Q All right. That accurately depicts it?
A Yes.
Q Could we go to Exhibit 151. Yes.
Would you look at Exhibit 151.1, please, not admitted yet, but see if you can identify this.
A Yes. This was the book that we were given from Clements Funeral Home after my sister's service, and it included all of the names of the people who attended.
Q You've kept that book?
A Yes.
Q Who kept it, Ms. Ferguson?

A Oh, my mother kept it and she always kept it, and then we later moved from Burnet to Brownwood, and of course she took the book with her. And --

Q Do you recognize the signatures or any of the handwriting in the book?

A Oh, yes, I recognized it all.

Q Whose handwriting?

A It was my mother's handwriting. Some of the handwriting is from the funeral home, but the small handwriting was -- is my mom's, and she wrote very small. And one of the things that really touched me about it was that she had written down the scriptures that were read.

Q Now, when did you get possession of this book, Ms. Ferguson?

A Unfortunately I lost my father in January of this year, and so I spent quite a bit of time at our house cleaning out things and just going through a lot, and I found this this summer, late July I think it was. We cleaned out a lot of things, and I found -- I found the baby book.

Q Had your mother predeceased your father?

A Yes. My mom died 20 years ago, 20 years before my father.

Q And your father, was he still in Texas?

A Yes.

Q All right. And --

A At the same house, yes.
Q -- you met with Dennis -- Agent Dennis Thomas on Saturday, correct?
A Yes.
Q And is that when you gave him the book?
A Yes. I gave him the book on Saturday. I brought it with me.
Q Had you told Agent Thomas about the book before then?
A No. I found it and, you know, it was very valuable to me and I didn't know if you all needed it, and I certainly didn't want to mail it, so I hand carried it with me.
MR. MUEHLECK: Your Honor, we'd like to offer 151 -- 151.1 into evidence and publish.
THE COURT: All right. Any objection?
MR. PRIMROSE: No objection, Your Honor.
THE COURT: Ms. Montague?
MS. MORRISON: No objection, Your Honor.
THE COURT: Received. You may publish.
(Exhibit 151.1 received into evidence.)
MR. MUEHLECK: Next page, please. There we go.
Q (BY MR. MUEHLECK:) Okay. This is the front of the book, Ms. Ferguson?
A Yes.
Q Next page. This records the date and the day of

the -- the date of death of your -- Julie Lyn Montague?
A Uh-huh.
Q Next page, please. On the left-hand side it says, "Cards and Messages of Condolence." Whose handwriting is that, do you recognize, Ms. Ferguson?
A Yes. That's my mother's.
Q And this was at the Moments of Meditation at Clement Chapel?
A Yes.
Q On the 29th of January 1968, at 4:00 P.M.?
A That's correct.
Q Next page, please.
It says "Relatives Who Came" on the left-hand side. Who are those relatives? Do you know those relatives?
A Yes. As I mentioned earlier, my grandmother, that's my mom's parents. We called them Big Daddy and Big Mama.
Q Yes.
A Of course they were there. Then on my dad's side, we called my grandmother Grandma Gussie, and then Buddy C, and Peggy. Buddy was my mother's brother, and then Lani and Wanda, that's my dad's brother and his wife. And then Charlene was my great aunt and Jerry is my mom's cousin.
Q Next page, please.
And this list on the right-hand side, the Parents' Autobiography?

A That's correct.
Q And Brothers and Sisters listed at the bottom?
A Yes. There's just my sister and I, yes.
Q Next page, please.
And the handwriting here on the left, do you recognize that?
A Yes. That's my mom's.
Q And then there are -- on the right-hand side these are people who visited, attended the memorial?
A Yes.
Q Next page, please.
And more signatures and names of people that visited?
THE COURT: Yeah, so the document speaks for itself. Let's move on.
MR. MUEHLECK: Yes, yes. Thank you, Your Honor.
Next page, please.
Q (BY MR. MUEHLECK:) Whose handwriting, please?
A That's my mother's.
Q Next page, please. Next page. That's the end of the booklet?
A Yes.
MR. MUEHLECK: A moment, please, Your Honor?
THE COURT: You may.
MR. MUEHLECK: Nothing further. Pass the witness.
THE COURT: Thank you. Mr. Fort, any questions?

MR. PRIMROSE: Yes, Your Honor, if you don't mind. Give me one moment, please.

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. PRIMROSE:

Q Good morning, Ms. Ferguson.

May I ask you when were you first notified of this supposed identity fraud? When were you -- when were you first --

MR. MUEHLECK: I can't hear the question, Your Honor, I'm sorry.

MR. PRIMROSE: I'm sorry. I'll --

THE COURT: All right. So wait. All right. Stop.

Okay. So your question is when was she first notified of this so-called identity fraud; is that what your question is?

MR. PRIMROSE: Yes, Your Honor.

THE COURT: All right. And your answer?

THE WITNESS: August of last year.

Q (BY MR. PRIMROSE:) And who contacted you?

A We first heard from a media source.

Q The government representatives, how many times did they contact you, may I ask?

A I don't recall the exact number, but I always felt that I was well informed.

Q Two, three times?

A In the course of a year?
Q Yes, ma'am.
A Probably more than that, just to keep me abreast of the trial.
Q Have you been made aware by the government of any other illicit activities having to do with this supposed identity fraud?
A No.
Q This is a personal question, but are you aggrieved by this situation?
A Extremely. This was such an emotional scar upon me and what I went through and seeing the pain my mother went through and packing away that nursery, that I never had children of my own.
Q But until one year ago, you had no information from the government or any other sources that there had been such an -- such an occasion?
A That's correct.
Q Thank you, ma'am. And one last personal question. Are you seeking reparations?
A No.
MR. PRIMROSE: Thank you, Your Honor. That's the end of questions.
THE COURT: All right. Ms. Montague, any questions?
MS. MORRISON: No questions, Your Honor.

Ms. Ferguson, I'm sorry for your loss.

THE WITNESS: Thank you.

THE COURT: All right. Thank you.

Okay. So, Mr. Muehleck, redirect?

MR. MUEHLECK: No questions, Your Honor. Thank you.

THE COURT: All right. Thank you very much. You're excused as a witness.

THE WITNESS: Thank you.

THE COURT: You're released from your subpoena and you can leave the District of Hawaii. Please don't discuss your testimony with anyone until the completion of the trial. Good day. Thank you.

Your next witness?

MR. MUEHLECK: Dina Bowers, Your Honor.

THE COURT: Thank you.

**DINA BOWERS, GOVERNMENT'S WITNESS, WAS SWORN**

THE COURTROOM MANAGER: Thank you. Please be seated.

If you'd state your full name and spell your last name for the record.

THE WITNESS: Dina Bowers, B-o-w-e-r-s.

THE COURT: All right. Your witness, Mr. Muehleck.

MR. MUEHLECK: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MUEHLECK:

Q Ms. Bowers, are you employed?
A Yes.
Q How are you employed?
A I am an assistant manager at the Kailua Mail Box in Kailua.
Q And what's the address there?
A 150 Hamakua Drive.
Q Assistant manager. How long have you been as an assistant manager?
A Just made 20 years in August.
Q Okay. And whose business is that?
A It's my father-in-law's business.
Q Okay. Is your husband part of that business?
A Yes. He's the general manager.
Q Okay. And what are your duties there at Kailua Mail Box?
A I handle payroll, employees, administrative stuff, I also answer phones, take payments, handle new leases, sort mail.
Q What services does the business provide?
A We rent storage lockers and mailboxes.
Q Okay. And have you provided records kept in the ordinary course of business from Kailua Mail Box to Diplomatic Security Service Agent Dennis Thomas?
A That's correct.

Q Would you recognize them if you saw them again?
A I believe so.
Q Okay. 93? Okay. Yeah. 93 -- I'm sorry -- Exhibit 93 to the witness.
You recognize Exhibit 93 or signatures on Exhibit 93?
A I do.
Q What is that, Ms. Bowers?
A That seems to be a subpoena or a response to a subpoena, and it has my husband's signature on it.
Q Okay. And your husband's position within the agency, within --
A He's the general manager.
MR. MUEHLECK: Okay. Offer 93 into evidence.
THE COURT: Any objection, Mr. Fort?
MR. PRIMROSE: No objections, Your Honor.
THE COURT: Any objection, Ms. Montague?
MS. MORRISON: No, ma'am.
THE COURT: Received. You may publish.
MR. MUEHLECK: Publish, please, Your Honor.
(Exhibit 93 received into evidence.)
Q (BY MR. MUEHLECK:) And next page, please. Okay. Can you recognize this?
A Yes.
Q What is this?
A This is an application that we -- that customers

fill out in order to receive mail through an agent such as ourselves or UPS Store, that kind of thing. This gets filed with the Post Master.

So it's just information about the tenant, the applicant, name, address, IDs, things like that.

Q Does the Postal Service require this?

A Yes, and I'm required to report to them quarterly on the activity.

Q Because you're receiving mail on behalf of someone from the United States that's delivered through the United States Post Office?

A Correct.

Q Can you tell us who the customer is here?

A Gwynn Primrose.

Q And to the right it says, "PM385." What is that, please?

A It stands for private mailbox, so that's just her mailbox number.

Q Okay. And then block 4 under Gwynn Primrose is the address?

A That's -- that's the Kailua Mail Box and our address, so that's where she is applying to have her mail delivered.

Q Okay. And then under that there's a signature?

A Yeah, that pertains to certified mail. That states

the tenant can decide whether or not they want us to sign for certified mail on their behalf.
Q Okay. And to the right of that over on the right-hand side there seems to be a home address?
A Looks like it, yes.
Q And an applicant's name?
A Yes.
Q Okay. And then there -- do you require identification?
A The Post Master requires two forms of ID to apply.
Q Are the forms of identification listed on this second page --
A There are --
Q -- of Exhibit 93?
A There are two forms of ID listed, yes.
Q Can you read what they are?
A It says, "Texas DL" -- I'm assuming that's a driver's license -- "02404744," and then the second one is a Maxwell Gunter Federal Credit Union teller card 58149000000532530.
Q Okay. And is there an employee or an agent's signature on that?
A Yes, Debra Driscoll.
Q And did she work for -- is she still employed there?
A No.

Q Was she an agent of the --
A She was at one time.
Q -- Mail Box?
And then there's a signature of the applicant to the right?
A Yes.
Q And a start date. What does the start date mean?
A That should be the date of the application, the day you open the mailbox.
Q Okay. Second page, please. No, went too far, I think. No. Is it? Okay. I'm sorry. This is a privacy statement. Next page, please.
What is this document?
A This seems to be how they kept records of identification to go with the application. It's -- I'm not familiar with this form, but just by looking at it and seeing the two ID's listed, I'm assuming that this is how they kept records of the IDs they collect. We keep copies on file now.
Q Did your husband and father-in-law buy this business?
A My father-in-law did.
Q Okay. And this was -- and did you inherit some of these records?
A Yeah.
Q Was this an inherited record?

A Yes.
Q For Box 385?
A Yes.
Q Okay. Next page.
And what is this document?
A That looks like a rental agreement between Kailua Mail Box and the applicant.
Q Okay. So this is the agreement with your business and the applicant?
A Correct.
Q For?
A Just the billing rates, rules and regulations pertaining to how to use your mailbox responsibly. It's just a user agreement, like a rental agreement.
Q Is this for -- is this payment or is this charge $31 a month or is it for several months?
A Uhm, it looks like that's for three months.
Q Three months, okay. Next page, please.
And then a -- no, okay. That's fine.
And then a signature of the agreement being accepted by someone?
A Yes.
Q And that name is?
A D. Driscoll -- or no, sorry -- above it Gwynn Primrose.

Q And the agent for the Mail Box company is --
A D. Driscoll.
Q Okay. Next page.
And more of the agreement?
A This is an updated rental agreement for our facility. It's just rates and rules had changed and needed to be updated, so we had all current tenants sign an updated rental agreement.
Q And is -- look down, if we could, at a social security number that's given?
A Uh-huh.
Q Who would put that in?
A The tenant.
Q And there's an address for the tenant?
A Yes.
Q And a city in where?
A Waipahu.
Q You've been on the island how long --
A All my life.
Q -- Ms. Bowers?
A All my life.
Q How far is Waipahu from your business in Hamakua Drive in Kailua? Any idea?
A It's a long drive. I mean, I don't know geographically what the distance is, but I avoid trips out

there, that's for sure.
Q Next page. Next page.
More of the agreement?
A Yes.
Q Next page.
A End of the agreement.
Q Okay. Next page.
All right. Payment history?
A Uh-huh.
Q That's how often it was paid or --
A It looks like it's a -- yeah, it's a payment history from 2012 to 2023.
Q Ms. Bowers --
A Yes.
Q -- did you work at the facility, in the office or where the mailboxes are?
A Yeah.
Q There's a counter there?
A Yes.
Q And do you, like -- what? -- rent or sell boxes if somebody wants to mail something?
A Yeah.
Q Okay. Do you know Gwynn Primrose?
A I do.
Q Did you ever talk to that customer?

A Yes.
Q And what would you talk about?
A Just friendly small talk, customer service stuff, just, Hi, how are you? How you been? Take a payment, hand the mail over, that kind of stuff.
Q Is Gwynn Primrose in the courtroom? You can step -- I think the Court will let you step down off the witness stand if you need a better view. But do you see Gwynn Primrose in the courtroom?
A I do.
Q You do? Point to her and tell me what she's wearing.
A She's wearing a black shirt (pointing).
Q What -- what -- what -- describe her clothing, the color of her clothing.
A I can only see from here up. It's a black shirt.
Q Two ladies in from the left?
A Yes, sir.
MR. MUEHLECK: May the record reflect the witness has identified the defendant, Gwynn Primrose, Your Honor?
THE COURT: It shall.
MR. MUEHLECK: Exhibit 93 -- I'm sorry. Exhibit 30, if we could look at that, please, Your Honor. I think we'll offer that in a moment.
THE COURT: All right. Any objection, Mr. Fort, to

Exhibit -- is it 30?

MR. MUEHLECK: 30, please.

THE COURT: 30, yeah?

MR. PRIMROSE: No objection, Your Honor.

THE COURT: Ms. Montague?

MS. MORRISON: No objection.

THE COURT: All right. Received. You may publish, if you wish.

MR. MUEHLECK: Please.

(Exhibit 30 received into evidence.)

Q (BY MR. MUEHLECK:) You recognize this, ma'am?
A I do.
Q What is this?
A It's just a tenant agreement about terminating your mailbox, giving notice, returning your keys, late fees, uhm, oversize item charge, just a general list of these and rules.
Q One of your forms?
A It's a form that the company used in the past, yes. I use a similar one.
Q Next page, please. You see this?
A Uh-huh.
Q Did we just look at this in the Exhibit 93?
A We looked at a different copy of it, I think.
Q Is it for the same mailbox?
A Yes.

Q Same tenant?
A Yes.
Q Next page. Next page. Same mailbox?
A Yep.
Q Next page. That's it?
Let's look at Exhibit 45, please.
THE COURT: Any objection --
MR. MUEHLECK: Not -- I'm not going to offer it yet, Your Honor. I'd just ask a question, if I could. We have another witness for that, Your Honor.
THE COURT: All right.
Q (BY MR. MUEHLECK:) Can you see the -- let's brought it up, yeah, Kari.
Can you see the number on that and --
A Yes.
Q -- looks like a what?
A Driver's license number.
Q From Texas?
A Yes. It appears to be, yeah.
Q Is that the same number that we see on Exhibit 30 and Exhibit 93?
A I believe so.
MR. MUEHLECK: Let's look at Exhibit 47, if we could, please, Your Honor.
THE COURT: You may.

Q (BY MR. MUEHLECK:) Do you see that long number?
A Uh-huh.
Q And the name Gwynn D. Primrose?
A Yes.
Q Is that the same number on the credit --
A Yes, sir.
Q -- the --
THE COURT: You have to wait till he finishes his question.
THE WITNESS: Oh, I'm sorry.
THE COURT: That's all right. Is that the same number on the exhibit that you looked at with the application, if you know?
MR. MUEHLECK: The application, previous application?
THE WITNESS: Yes, sir.
Q (BY MR. MUEHLECK:) Okay. Next -- yes, we'd like to go into 117.
Did you have video surveillance at the facility?
A Yes.
Q Where were the cameras?
A We have them all over the place. There's several in the office and in all the high traffic hallways, outside in the parking lots, everywhere.
Q And you've had those for a while?

A Yeah.
Q Okay. And did Diplomatic Security Service and the FBI ask you to search the -- your video cameras?
A It was done. I don't know if they asked that of us, but I know my husband had somebody do that.
Q How long did that take?
A About a day.
Q Who paid for that?
A We did.
Q Did the FBI provide you a thousand dollar stipend for this?
A To my husband.
MR. MUEHLECK: Okay. Let's look at Exhibit 117, 117.1 -- I'm sorry -- 117.2, Your Honor, just to the witness to see if she could recognize the angle, what it shows.
THE COURT: I don't know. I don't know if it has sound. So are you going to offer this into evidence?
MR. MUEHLECK: We will, Your Honor.
THE COURT: All right. Do you folks object, Mr. Fort?
MR. PRIMROSE: No, Your Honor.
THE COURT: Ms. Montague?
MS. MORRISON: No, ma'am.
THE COURT: I'll just receive it now. They're not going to object to it.

MR. MUEHLECK: That's fine, Your Honor. 117.2, and we'd like it published.

THE COURT: Does it have audio?

MR. MUEHLECK: It does not.

THE COURT: Okay.

(Exhibit 117.2 received into evidence.)

Q (BY MR. MUEHLECK:) What is this, please?

A That's the view of our front door, the office door, the entrance to the mailboxes.

Q Is the date of the camera and when it was engaged on that?

A Uh-huh.

Q December 23rd of 2021?

A Yes.

Q So 1331 would be like 1 -- 1:31 P.M.?

A About there, yeah.

Q This is a military time?

A Uh-huh.

MR. MUEHLECK: Play it, please.

(Video played, not reported.)

Q (BY MR. MUEHLECK:) Who's that?

A Gwynn Primrose.

Q Is that the box she rented she's opening?

A Uh-huh, yes.

MR. MUEHLECK: Your Honor, we'd like to offer 117.4.

THE COURT: .4? Okay.

MR. MUEHLECK: Yes.

THE COURT: All right.

MR. MUEHLECK: Another one.

THE COURT: Any objection?

MR. PRIMROSE: No objection, Your Honor.

THE COURT: Any --

MS. MORRISON: No objection.

THE COURT: All right. Received.

MR. MUEHLECK: Publish, Your Honor?

THE COURT: You may.

(Exhibit 117.4 received into evidence.)

Q (BY MR. MUEHLECK:) What is this, please?

A This is an exterior view of the sidewalk in front of the building leading up to the entrance.

Q You recognize that person?

A Yes.

Q Who's that?

A Gwynn Primrose.

MR. MUEHLECK: That's fine on that. Let's go 117.6. We'd like to offer that, Your Honor.

THE COURT: Any objection?

MR. PRIMROSE: No objection, Your Honor.

MS. MORRISON: No objection.

THE COURT: Received. You may publish.

MR. MUEHLECK: Publish, please, Your Honor.
(Exhibit 117.6 received into evidence.)
Q (BY MR. MUEHLECK:) What is this view, please, Ms. Bowers?
A This is a overview of the front desk, our main workstation.
Q Who's that person coming there?
A That's Gwynn Primrose and that's myself.
Q You just walked up and handed her a box and you're sitting at the desk?
A Correct.
Q That's still on December 23rd of 2021?
A Correct.
MR. MUEHLECK: Let's go to 117.7, please. Hmm? I can't hear you. Well, put it up on the screen, please. The Court will publish it, the Court'll offer it -- if we offer it.
Okay. We would offer 117, Your Honor.
THE COURT: Any objections?
MR. PRIMROSE: No objections, Your Honor.
MS. MORRISON: No objection.
THE COURT: All right. Received. You may publish.
(Exhibit 117.7 received into evidence.)
MR. MUEHLECK: Go ahead play it, please.
Q (BY MR. MUEHLECK:) This is where?
A The entrance, the front entrance to the building,

our front office.

Q On December 23rd of 2021?

A Correct.

Q Okay.

(Video played, not reported.)

MR. MUEHLECK: And the last one we would offer, Your Honor, is 117.8.

THE COURT: All right. Any objection to 117.8?

MR. PRIMROSE: No, Your Honor, no objection.

MS. MORRISON: No, Your Honor.

THE COURT: All right. Received.

MR. MUEHLECK: Publish, please, Your Honor.

THE COURT: You may.

(Exhibit 117.8 received into evidence.)

(Video played, not reported.)

Q (BY MR. MUEHLECK:) Who's that, please?

A Gwynn Primrose.

Q Walking away from the store?

A Correct.

Q On January -- excuse me -- December 23rd, 2021?

A Yes.

MR. MUEHLECK: Thank you. Pass the witness, Your Honor.

THE COURT: All right. Thank you.

Mr. Fort, any questions?

MR. PRIMROSE: Yes, Your Honor, I do have some questions.

THE COURT: Please.

MR. PRIMROSE: It'll take me a second to gather my notes.

CROSS-EXAMINATION

BY MR. PRIMROSE:

Q Good morning.

A Good morning.

Q When did the government first contact you with supposed identity fraud? When were you made aware of this?

A I was made aware of it I believe in July of 2021, maybe. It could have been sooner than that, though. I'm not clear on it.

Q So it would be the year 2021; is that correct?

A I believe so.

Q So you inspected or handled all the mail or most of the mail as it went through the -- your service; is that correct?

A Uh-huh, yes.

Q Were you aware of any other illicit activities, mail carries, drugs and guns and things like that? Were you aware of that?

A In the past we've assisted the government with some things that you shouldn't mail kind of things.

Q Okay. So you're aware of that?
A Absolutely.
Q So your particular client, were you aware of any activities that client did in that manner?
A I don't understand the question. I'm sorry.
Q I'll put it more specifically. Do you know whether your client or do you -- had you suspected your client of any other illicit activities, such as drugs, guns, mail fraud, anything like that?
A No.
Q No. So no other -- other than the suspected identity fraud, there was seemingly, to your opinion, that there was no other activity?
A Correct.
Q Did your client pay for the mailbox in a timely manner?
A Yes.
Q Every time?
A Yes.
Q And I have one last very odd question. We did get -- we didn't get a copy of the check, but we did get a notice that you had gotten a thousand dollars for evidently some sort of reparations. Would you describe that? We got a one sentence and that was all it said.
A I have very little knowledge of it, sir.

Q So who was the --

A My husband received something, yes.

Q Your husband received something, but you do not know why?

A No.

Q That is the question. So you -- we haven't seen anything. This is the first that we've heard of it, and now we realize that there was a thousand dollars that came from the FBI and had no reason -- reason why --

THE COURT: So what's your question? You have to ask a question of the witness.

MR. PRIMROSE: Question?

THE COURT: Uh-huh.

MR. PRIMROSE: I'll pass -- I'll -- I'm ending the questions.

THE COURT: All right. Thank you.

Ms. Montague, any questions?

MS. MORRISON: Yes, Your Honor.

CROSS-EXAMINATION

BY MS. MORRISON:

Q The thousand dollar check was in return for your husband looking through the tapes of your customers; is this correct?

A I believe so.

Q Okay. Are you -- you are familiar with the type of

mail that was received at that box, Box 385?
A Yes.
Q And there -- what type of mail was generally received there? I mean, letters? Packages --
A Letters, billings, packages, all the standard stuff.
Q So was there anything suspicious in any way other than just regular mail?
A No.
Q So no -- nothing that would make you suspect any kind of mail fraud, any kind of illicit anything --
A No.
Q -- being shipped from or being received there?
A No.
MS. MORRISON: Thank you. That's all my questions.
THE COURT: Any redirect?
MR. MUEHLECK: Yes, please.

REDIRECT EXAMINATION

BY MR. MUEHLECK:
Q The mail that was received there addressed to who? What names did you see?
A Gwynn Primrose. Occasionally there was something addressed to Gwynn and Walter Primrose.
MR. MUEHLECK: Thank you.
THE COURT: All right. There being no further questions --

MR. MUEHLECK: May the witness be excused to leave the district? She has business on the mainland, Your Honor.

THE COURT: Yes, she may.

All right. So you're excused as a witness. You're released from your subpoena and you may leave the district. Please don't discuss your testimony with anyone until the conclusion of the case. Good day. Thank you.

THE WITNESS: Thanks.

THE COURT: Your next witness?

MR. MUEHLECK: We would like to play a videotape, Your Honor, which is Exhibit 136. And we would like to offer that and publish it, Your Honor. We have transcripts, if the Court wishes us to use them as a crutch, whatever, Your Honor.

THE COURT: All right. If you could provide those to Ms. Elkington?

MR. MUEHLECK: Yes. Yes, ma'am, Your Honor.

THE COURT: Mr. Fort, Ms. Montague, the court has previously ruled upon evidentiary --

MR. MUEHLECK: Thank you.

THE COURT: -- objections and also with regard to the admission of the video testimony. Is there any -- are there any additional objections that you might place on the record?

MR. PRIMROSE: No, Your Honor. We accept the video.

THE COURT: All right.

MS. MORRISON: No, Your Honor.

THE COURT: All right. Thank you.

(Exhibit 136 received into evidence.)

THE COURT: All right. So, ladies and gentlemen, we're going to play the Government's Exhibit 136. It is a video of a deposition that was taken. As I've indicated to you, witnesses can testify by deposition. These are taken under oath and recorded. There is a copy of the transcript portion that's going to be handed out to you. It is not evidence, but merely to assist you in listening and watching the video. It shouldn't impede in any way in you folks observing the witness.

Once the testimony's completed, it'll be taken back from you and it will not be an exhibit that you will be able to review during your deliberations. All right? So please don't let the transcript distract you from observing the witness and listening to the witness, but it's just an aid; it is not evidence itself.

MR. MUEHLECK: It -- the audio starts on page 4, Your Honor, of the transcript.

THE COURT: All right. Thank you.

All right. You may go ahead and --

MR. MUEHLECK: Publish, Your Honor?

THE COURT: -- publish, yes. Thank you.

(Video played, not reported from 10:56 to 11:20 A.M.)

MR. MUEHLECK: We have -- would like to enter -- introduce Exhibits 10, Your Honor, and another exhibit after that.

THE COURT: All right. Any objection to Exhibit 10, Mr. Fort?

MR. PRIMROSE: Give me just a second, Your Honor, to pull it up.

THE COURT: Sure.

MR. PRIMROSE: Yes. No objection, Your Honor.

THE COURT: All right. Ms. Montague?

MS. MORRISON: No objection, Your Honor.

THE COURT: All right. So Exhibit 10 is received.

(Exhibit 10 received into evidence.)

MR. MUEHLECK: Publish, please, Your Honor?

THE COURT: You may. All right. So Exhibit 10 is being published to the jury and it is the Department of State Health Services Vital Statistics, a certificate of birth in the state of Texas.

All right. Your next witness?

MR. MUEHLECK: Exhibit we'd like to offer, Your Honor, Exhibit 11 into evidence.

THE COURT: Any objections?

MR. PRIMROSE: No objection, Your Honor.

MS. MORRISON: No objection.

THE COURT: All right. Received. Do you wish to

publish?

MR. MUEHLECK: We would like to publish, please, Your Honor.

(Exhibit 11 received into evidence.)

THE COURT: And the record will reflect that the jury's being shown by publication Exhibit 11 which is a Certificate of Live Birth in the Commonwealth of Virginia.

All right. Anything further in terms of exhibits or can we go to our next witness?

MR. MUEHLECK: No. Next witness, Your Honor.

THE COURT: All right.

MR. MUEHLECK: Call Payton Garbarino, Your Honor.

THE COURT: All right. While they're getting the next witness, just want to check in with the jury. You're all all right? Do you need a rest break or we can go on with the next witness?

(No response.)

Okay. All right.

MR. MUEHLECK: This one may take a little longer, Your Honor.

THE COURT: Well, we may take a break in the middle of the witness.

Oh, did you collect the transcripts back from the jury?

MR. MUEHLECK: Right up there, please, sir. Thank you.

THE COURT: Good morning, sir.
Please administer the oath to the witness.

**PAYTON GARBARINO, GOVERNMENT'S WITNESS, WAS SWORN**

THE COURTROOM MANAGER: Thank you, please be seated.
If you'd state your first name and spell your last name for the record.
THE WITNESS: First name is Payton and my last name is Garbarino, G-a-r-b-a-r-i-n-o.
THE COURT: Your witness.
MR. MUEHLECK: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MUEHLECK:
Q Mr. Garbarino, are you employed?
A Yes.
Q How are you employed?
A I'm a Fraud Program Manager with the Department of State at the National Passport Center.
Q And what are you currently -- where do you currently work? What's the National Passport Center?
A National Passport Center is located in Portsmouth, New Hampshire. It's the largest passport center in the United States and we process roughly one-third of the nation's passport load.
Q Are there other passport centers in the United States?

A Yes. They're broken up between centers and agencies. Centers denote that it's a larger center, the passport center, National Passport Center, Charleston Passport Center, and the Tucson Passport Center or which is called the Western Passport Center, and all told there are 29 agencies and passport centers together.

Q And in New Hampshire what are the employees made up of? What makes up that National Passport Center?

A There are approximately 300 passport adjudicators. Those are the folks that actually look at passport applications and decide citizenship and identification and decide if the person who has applied for a passport is entitled to that passport; they will issue that. So there are about approximately 300. I am one of five Fraud Program Managers, sometimes referred to as a Fraud Prevention Manager or an FPM, so I have four other colleagues.

And if those adjudicators on the floor during the course of their day they suspect that there may be some fraud associated with that application, that gets referred to my office where we can do a little bit more of an in depth research on the actual case itself. We have the time to do that in my office.

Q How are passports accepted, Mr. Garbarino?

A There's generally two types: The DS-11, which is usually for folks applying for the first time or if they

haven't applied for a passport within the last 15 years, or there's a DS-82 which is a renewal, meaning that you have a currently valid passport application issued within the last 15 years, and you mail that in yourself.

Both of those applications would go to the same location; it's a collection facility. Right now it's -- City Bank is the name of the facility. It's located in Philadelphia. So if you've ever mailed in a passport application, you know you mail it to Philadelphia. It then gets distributed based on region to that -- to the appropriate office, the center or agency, and that distribution can depend upon workload, base -- you know, if one agency has more work or less work, that may get shifted towards that agency.

My passport center, we take in work from all over the country, so we are not -- we don't really have a region. We take in work -- since we're so big, we're the largest facility, we can handle fluctuations of workload, so we do take on a lot of work from all over the country.

Q Are there -- oh, then would you -- are there required documents or information required for a passport? What are the required documents, if any?

A Like I said earlier, to obtain a passport you need to prove really two things: The two main things, citizenship, are you a citizen of the United States of America, and identification, are you who you say you are.

Generally citizenship documents can be anything like a birth certificate, a naturalization certificate, could be a recently -- or a passport. A passport only serves as a form of citizenship. And the identification is usually in the form of a driver's license, government ID. There are secondary forms you can use if you don't have a driver's license to prove that you are who you say you are. But generally it's identification and citizenship is what you want to prove to get a passport.

Q And what information is -- and what information is required then on an application to get a passport? What do you have to present? What do you have to do? What do you have to give them?

A You have to fill out the application truthfully, denoting your name, date of birth, place of birth. You have to give your address, both physical and mailing address. You have to submit that documentation with your application, whether it's a birth certificate form, or previous passport, or a naturalization certificate.

You have to -- if you've ever had a passport prior to that, you have to disclose that you've had a previous passport, and that's the citizenship.

If we -- if the adjudicators -- those are the folks, those approximately 300 folks that work that case -- if they at any time feel that they want additional information, let's say that what you've submitted is insufficient, they always have

the right to ask for more. They would do that by a certified letter from -- you know, we send it by U.S. Post and we would ask for that insufficiency. Let's say, for instance, you wanted more identification information; we could ask for that. We could ask for more ID, we could ask for birth facts, we could ask for additional documents to prove citizenship.

Q And documents have to be presented with a passport application?

A Yes.

Q Okay. Do those documents become part of the passport application record?

A Yes.

Q And are there any screening checks performed on passport applications?

A Yes, there are a number of screening checks. The system that we use is called Travel Document Issuance System, otherwise known as TDIS, and when that passport application initially comes into that system, there will be called front-end checks. Those are electrically done, not by human; it's done by a computer. It checks for things like maybe you owe child support. If you are -- if you do owe child support, you're not eligible for a passport. If you have any wants or warrants out in your name, you may not be eligible for a passport. Also may check for things like indebtedness to the U.S. government; if you owe money, you may not be eligible as

well. So those checks are done in front before it ever gets to a human being.

Q Would -- when would a -- or why would a passport application be referred to your section, the Fraud Program Management -- the Fraud Program Manager section?

A Could be for a number of reasons. If we call the floor where the adjudicators work, they may see something that they think is potentially fraudulent, maybe that birth certificate being used is either counterfeit or altered. The difference between counterfeit and altered is that a counterfeit document is something that's really created almost out of thin air. The paper that it's printed on is not good and the information that is on there is not good either.

An altered document is a good or genuine birth certificate, or maybe that person might have erased their name or date of birth or place of birth and tried to put different information on there.

So let's say adjudicators see either a counterfeit or an altered document, they will refer it to my office where we have the time to do more in depth research.

Could also be some of those electronic checks that I mentioned before. If the person, like I said, had any wants or warrants out for their name, that would get referred to my office. If any other electronic checks came back which raised flags, they may send that to my office as well where we have

the time to conduct that research.

Q Your office, you said, is the Fraud Program Management or Fraud Program Manager?

A Yeah, the Fraud Management Office, yes.

Q I'm sorry?

A Fraud Prevention Office, yes.

Q All right. What does passport fraud look like?

A In general?

Q Yes.

A Like I said, it could run the gamut of the citizenship fraud. Like I said, there's really the two, ID and citizenship. That citizenship fraud is where someone's created a birth certificate, either altered that document or they -- it's counterfeit.

There's also ID theft or identification theft where you're taking over the identity of another person. That could be either you've obtained documents for another person who you do not have a right to use, you could have stolen those documents, you could have paid the person for those documents. So really --

Q Well, would you call that like imposter fraud?

A Yes, that would be an imposter, an imposter to a U.S. citizen.

Q And what happens if FPM suspects a crime has occurred?

A Once we suspect a crime has occurred -- we are not law enforcement officers -- we would refer that case to our partners in Diplomatic Security. They are law enforcement agents who conduct the investigation if we suspect a crime has been committed.

Q The agency that Agent Thomas belongs to?

A Yes, that's correct.

MR. MUEHLECK: Okay. Can we look at Exhibit 7? I believe this is a certified record, Your Honor. We'd like to offer this into evidence, Exhibit 7.

THE COURT: Any objections, Mr. Fort?

MR. PRIMROSE: No objection, Your Honor.

THE COURT: Ms. Montague?

MS. MORRISON: No objection.

THE COURT: Received. You may publish.

MR. MUEHLECK: Publish, please, Your Honor.

THE COURT: You may.

(Exhibit 7 received into evidence.)

Q (BY MR. MUEHLECK:) Can you tell us what this is, that first page?

A This looks like a -- a official notice from the Chief of Records Creation and Retention Division. That is the clearinghouse where we send all of our scanned documents to. Once again, like I said, when you apply for a passport, you get your documents, like your birth certificates, back; however, we

do take a scan of that and send those to our clearinghouse.
Q You keep those?
A A scan of them, yes.
Q A scan of them, all right.
And Antony Blinken, of course, is the Secretary of State.
A Secretary of State, yes.
Q Okay. Next page, please.
And that's the affidavit --
A Yes.
Q -- of the custodian who certifies them?
A Yes.
Q Next page, please. Next page, please.
And that's the records creation signature of a person for --
A Yes, it is.
Q Shelton?
A Yes.
Q Okay. Next page, please.
What are we looking at here, please, sir?
May I have a seat, Your Honor?
THE COURT: You may.
MR. MUEHLECK: Thank you.
Q (BY MR. MUEHLECK:) What are we looking at here, sir?
A This is a passport application for a Bobby Edward

Fort, born 7-22-1967 in Dallas, Texas.

Q Okay. And the information that has to be provided?

A Yes. The information is the -- that is the social security number there to the top right. It looks like this was issued November 19th, 1996. You have the permanent address, and then below there you have the parental information; appears the father's name is marked as Unknown and the mother's maiden name is Charlotte Fort of Dallas, Texas.

Q Appears to be quite a bit of information you ask on these passport applications, sir.

A Yes.

Q Scroll down, please.

Now -- just -- okay. Okay. There it is.

And there's a picture required?

A Yes, there's always a picture required on a passport application. You're also -- you're also required to say whether or not you've been issued a previous passport. There is --

Q All right. And then there is marriage information?

A Marriage information. Obviously we want to do that to ensure a lot of times if you've ever changed your name, we want to be able, as I said earlier, run that name to make sure there's no wants or warrants, no indebtedness to the U.S. government, child arrearage, anything like -- child support arrearage.

Q Go back up a little bit, Kari. Yeah, this line here. All right. Thank you.

All right. And it's -- it's -- it says "Your place of birth," and then line 17, block 17, sir.

A Yes, "Have you ever been issued a U.S. passport, yes or no?"

And it appears that "No" has been highlighted here. That was checked off by the applicant.

Q And if you had a previous application or previously been issued a passport, you were supposed to put that number in there of the passport?

A Yes. You check the "Yes" box and you put your passport number and the date that it was issued and then the disposition of that passport, whether you were submitting it or whether it had been lost.

Q All right. Now, would you -- and it indicates also name you've used if you've been issued a previous passport?

A That's correct.

Q And the issue date of the previous passport?

A Correct.

Q Now scroll down, please.

All right. Where was this -- where was this done? Can you tell us on this application?

A This -- by done, looks like the -- this was accepted, I believe, in Pasquotank, North Carolina.

Q Okay.

A So that was where it was accepted. So this is called a DS-11 application.

Q Please explain.

A Sure. These are generally applications that are used for a first-time applicant, meaning you've never had a passport before. This is where you go to an acceptance agent, usually at your -- most often at the U.S. Postal Service. It could be at your public library or your town clerk's office.

And you would -- you would go in there, you would pay your money, you would give them that, you would take the oath that you see right -- that you see on the application there. You would attest that everything on the application is true as you know it. Then you would also provide your citizenship documents, like birth certificate. You would also provide your identity documents, like a driver's license.

That acceptance agent would then notate that on the application itself and then submit a copy of the driver's license and a -- the original birth certificate with the passport application.

Q Can you tell what's been submitted as the supporting documentation here?

A Sure. It looks like for identity documents it was a North Carolina driver's license issued in 1996 with the expiration date of 2002.

The ID number --

Q When was it issued, sir?

A The identification document?

Q The driver's license.

A Oh, I'm sorry, the driver's license. It looks like 1997 -- I can't read all the way to the left of that -- but it looks like -- yeah, so it looks like January 16th of 1996.

Q Open --

A I'm sorry, excuse me. July 16th of 1996.

Q All right. And the date that this application for the passport was made?

A "Subscribed and sworn to me on 11-8-96."

Q So this driver's license is four months old -- less than four months old?

A Correct.

Q All right. And the block 23, it says "For Issuing Office Only." What is that?

A That is only used for the passport adjudicators. That's when it gets to the Department of State.

It appears that this is where you check off the citizenship evidence that was submitted with the application, and it appears that a birth certificate was submitted.

The SR, CR, and City is for the State Record, County Record, or City Record. It appears that a state record was submitted.

And Filed and Issued is -- 1967 is when the document was filed. Generally we like to see birth certificates that are filed within one year of birth. This person was born in 1967. It was filed in 1967 with the state registrar, and it was issued to the applicant in 1987, that is when the person actually appeared at the state registrar's office and asked for a copy of their birth certificate.

Q So it's a birth -- a birth -- a date of birth of around '67 you're saying, and the birth certificate was issued to the applicant around '87?

A That's correct.

Q Can we go up to the top? All right. Let's -- can we expand this? Okay?

There seem to be -- well, maybe it's crossed out. Is it -- there's something crossed out on the date of birth or what? Can you see that?

A Yeah. It appears there may have just been some confusion, looks like it might have been done with a typewriter, and maybe the 22 for the date of birth overlapped with the line, so the adjudicators -- adjudicators always use red pen, so any time you see red pen on the application, that's the state adjudicators making that mark. They just corrected it to make sure there was no mistake that the date of birth was July 22nd, 1967.

Q Okay. All right. Let's go to down further. Yeah,

let's move down. What's this next document, sir?
A This is another passport application for Bobby Edward Fort.
Q Can you tell what type of passport this is, what -- is this personal or what?
A This would be an Official Book, if you look up on the top right of the screen.
Q Yes?
A You'll see where the letter O is circled. That's stands for Official.
Q Is that marked in red or --
A That is marked in red.
Q That's the adjudicator's mark?
A That is the adjudicator's mark and it has the endorsement below that. Endorsement number 10 is an official endorsement which essentially states that the bearer of this passport is on official business for the United States.
Q Mr. Garbarino, there seem to be a lot of red marks on this?
A Yes, there is.
Q Indicating?
A It's just indicating what the adjudicator saw. Now, each adjudicator individually can make -- there are certain marks they have to make, generally always circle the place of birth, you're going to circle the sex of the applicant, whether

they're male or female. As you can see here, just below that, it says passport number for most recent passport enclosed, S and R stands for Seen and Returned, which means that the passport was still valid at the time, so it was a tourist book. They didn't want to cancel it, so they just marked that they saw and returned it to the applicant.

Q Okay. And then there's emergency contact information?

A Correct.

Q And of course, above that a name and below that is -- there's a name and then a address and a phone number?

A Yes.

Q And the spouse relationship is "Wife"?

A Yes.

Q Okay. And then the passport's permanent address is Pearl City, Hawaii, Moanalua Road?

A Yes.

Q Okay. Let's scroll down.

Now, does someone have to appear in this, or how does one get this? What's done with this application?

A No. This is a DS-82. This is a renewal. Since the applicant had a valid passport application, they could mail it in rather than having to go to an acceptance agent. So as long as they signed that, which this person did, Bobby Fort -- Bobby E. Fort signed on 8-28-2001, they are attesting to that oath

that they are taking.

Q Go up a little bit, please, Kari. Well, somewhere here. Okay. Down a little bit, Dennis.

Okay. It says -- next to the picture it says "Oath and Signature."

A Yeah.

Q So there's still an oath they have to take even though they don't appear anywhere?

A Yes. As soon as you've -- yes, once you've signed that, you've taken that oath.

Q Okay. Let's go to the next exhibit, please -- or the next item in this exhibit, a Request for Official Passport Action. This is submitted by the government on behalf of this individual?

A Yes. It's usually submitted by the individual's employer which is -- which would be generally a government agency.

Q And in this case it's the Coast Guard Air Station Barbers Point?

A Yes, U.S. Coast Guard.

Q Okay. Down. And the signature's blocked, I guess, personal signature. That's redacted?

A Yeah, that appears to be redacted. Again, that would be from the employer or the person requesting the official book on behalf of the applicant.

Q Next page, please. Okay. All right. Another exhibit, or this is another -- what is this particular document, sir?

A This, again, is a DS-82 renewal for a passport -- passport application. This is for Bobby Edward Fort born July 22nd, 1967, date -- place of birth in Dallas, Texas. As you can see the T-X is circled. That is the -- we use the two digit code for U.S. states and there's a three digit code if you're born abroad for countries outside the United States.

Q That's the adjudicator's portion?

A Yes.

Q And his occupation there it assesses -- I'm sorry. His occupation there is?

A Occupation is military, and the employer was the U.S. Coast Guard.

Q And his -- the passport is to be mailed to an address?

A Yes. It was mailed to 4725 Bougainville Drive, Honolulu, Hawaii, 96818, Apartment 370.

Q Apartment, not Post Office Box? Apartment?

A Yes, Apartment 370.

Q Okay. Down on that, please.

And it's signed at the bottom, okay, on 19 November, 1996?

A Is it -- is it signed on the --

Q That second page, I'm sorry.

A Second page?

Q Second page. There we go. Up at the top?

A Yes, yes, it is signed and it's signed on October 3rd, 2006.

Q Okay. Next document, please. There we go. Next page. Next page. There.

Okay. What is this document, sir?

A This is another DS-82 renewal passport application for Bobby Edward Fort born July 22nd, 1967, in Dallas, Texas.

Q Okay. Same name as before?

A Correct.

Q Okay. Where is this one submitted from or where is -- where is his address here? What do we got?

A It is a PO Box 8965 in Kodiak, Alaska, zip code 99615.

Q All right. Go down, please. This is dated when?

A It was signed February 12th, 2016.

Q All right. And it requires an oath on this?

A Yes. Again, there was -- since it's in '82, once I sign that, you are taking the oath -- you're attesting to that oath.

MR. MUEHLECK: Could we go to Exhibit 8, please, Your Honor? We believe we'll offer for this again as a

certified record?

THE COURT: All right. Any objection?

MR. PRIMROSE: No objection, Your Honor.

MS. MORRISON: No, Your Honor.

THE COURT: All right. Received. Do you wish to publish?

MR. MUEHLECK: Yes, Your Honor, page by page.

(Exhibit 8 received into evidence.)

Q (BY MR. MUEHLECK:) This is the cover sheet, the certification of the Department of State, sir?

A Yes.

Q Next page.

And more about the information that's disclosed here?

A Yes.

Q Next page, please.

And the signature of the Retention Division?

A Yes.

Q Next page, please.

Okay. What is this, sir?

A This is a DS-11 passport application generally used for new applicants for --

Q This is -- go ahead, sir.

A I was -- for the applicant Julie Lyn Montague, date of birth appears to be January 7th, 1968, born in Burnet, Texas.

Q Okay. Burnet with one T?
A Yes, Burnet with one T.
Q And what's the address where it's -- the mailing address?
A 1851 West Ehringhaus Street, No. 132, Elizabeth City, North Carolina 24909.
Q And it includes a social security number?
A Yes, social security number is down on the right, appears to be XXX-XX-3279.
Q And in block 14 and 15 there is a father's name and a mother's name. Are they filled in?
A Yes, the parental information is complete.
Q Can you read the name, father?
A Appears to be John Montague.
Q Okay.
A And the mother is Dora -- Doreen Casey.
Q Okay. Go down, Dennis. Scroll down, please.
And this is filled out when, the application?
A It was submitted to the acceptance agent and filled out on November 8th of 1996.
Q The same date as the previous one we looked at for Bobby Edward Fort, his North Carolina application?
A Correct.
Q In the same county, Pasquotank County, North Carolina?

A Yes.

Q And the identification documents that are provided?

A Looks like a military ID was used with an issue date of October 11th, 1996, and an expiration date of July 18th, 1999, and it was issued out of Elizabeth City, North Carolina.

Q And -- okay. Is there a birth certificate indicated?

A Yes, there is. The applicant used a birth certificate. Again, it was a state record, as you can see with the red tick mark there.

Q Block 23 we're talking about?

A Block 23 at the bottom. It was filed in 1968 and it was issued to the applicant in 1987.

Q Indicating what, the filing and the issuance?

A The file date is when the state registrar -- it was -- the birth was filed with the state registrar. When you're born, obviously you have to let your state, county, or local officials know that. So the state was notified that this child was born in 1968. And then the applicant obtained the birth certificate from that state registrar in 1987.

Q How would someone that had a name change apply for a passport?

A Any time you have a name change, you generally have to submit a court-ordered document and that could come in the form of obviously just a court-ordered document through a name

change; it could be through a divorce decree. Those are generally the terms that you would use that, how you generally need a court order -- or a marriage certificate, obviously, as well that serves as a court-ordered name change.

Q Could one live -- just change their name and by custom and live that way with a name change?

A Yes.

Q And what is required as to just a nonformal, that is, a noncourt name change? What is required?

A Generally referred to as a customary name change, you have to present at least three documents going back five years showing exclusive use of that name.

Q Exclusive use, what do you mean?

A Means you can only be using that name. You can't be using one name and the other name interchangeably.

Q So you can't be Joe Smith and John Doe?

A No.

Q All right. Anything else on this one?

Let's move down to the next document. What is this next document, sir?

A This is a DS-82 renewal for Julie Lyn Montague born January 7th, 1968.

Q Same person that we just looked at in the North Carolina application?

A Yes, born Burnett, Texas.

Q How many -- how do we spell Burnett in this one?
A B-u-r-n-e-t-t.
Q Two Ts?
A Correct.
Q Was the previous application one T?
A Yes.
Q And let's move down. There's the photo.
A Correct.
Q And then the address, "Mail My Passport To"?
A 4725 Bougainville Drive, Honolulu, Hawaii, 96818.
Q And what does she list as her parking -- her occupation, block 9?
A It's a parking valet and the employer is Diamond Parking.
Q Move down, please. Go ahead.
Okay. The next document is here in this exhibit.
A This is a DS-82 application again for Julie Lyn Montague born January 7th, 1968, in Burnet, Texas.
Q One T in this Burnet, right?
A Yes.
Q And the mailing address?
A Is 4725 Bougainville Drive, Suite 370, Honolulu, Hawaii, 96818.
Q Move down, please.
There's the photo.

A Yes, that's correct.
Q And the oath is taken?
A The oath is taken upon signing of the application which was done April 6th, 2016.
Q Go to the next exhibit. Let's go to Exhibit 9, Your Honor, if we could, please?
THE COURT: All right. Any objection to --
MR. MUEHLECK: We're going to offer -- we're going to offer it, too, Your Honor. It's again a certified document.
THE COURT: All right. Any objection?
MR. PRIMROSE: No objections, Your Honor.
THE COURT: Ms. Montague?
MS. MORRISON: No objection.
THE COURT: All right. Received.
(Exhibit 9 received into evidence.)
MR. MUEHLECK: Publish, please, Your Honor?
THE COURT: You may.
Q (BY MR. MUEHLECK:) Again, the cover sheet and the seal of the Department of State, sir?
A Yes.
Q Page 1?
A Correct.
Q Move on. And the information that's saying how they regularly keep this information at the Department of State?
A Yes.

Q Next page. And the signature of the records -- the Records Creation and Retention Division Officer?
A Yes.
Q Next page. What do we have here, sir?
A This is a passport application for Walter Glenn Primrose and it is a -- it's a DS-82 application.
Q Meaning?
A Meaning it's a renewal, so --
Q So there was -- there is a previous passport issued for Walter Glenn Primrose before this?
A Yes.
Q Okay. And is it listed as -- is it identified?
A Yes. As you can see, the passport number is HG930146.
Q Issued when?
A April 28th, 1987, from Houston, Texas.
Q Okay. And the place of birth of this individual is?
A It's like Thompson, Texas.
Q And the address where the Mail the Passport is in a Virginia address, Chesapeak, Virginia?
A Yes.
Q 801 Volvo Parkway?
A Yes.
Q Date of birth, please?
A December 17th, 1955.

Q And the oath is taken on this?
A Yes.
Q Of March 30th, 1999?
A Yes.
Q Let's go to the next item, please.

THE COURT: Would this be a good time to take our last recess --

MR. MUEHLECK: Oh, absolutely, Your Honor. I missed it, please.

THE COURT: No, no.

So, ladies and gentlemen, we'll take our last recess of the day. Please put away your notebooks. Of course, don't discuss the case with anyone or allow anyone to discuss it with you. Don't do any research on your own or anything on social media.

We'll take a 15-minute recess and we'll come back for our last session for the day.

Please rise for the jury. They're in recess, as are we.

(A recess was taken.)

(Open court in the presence of the jury.)

THE COURT: All right. Welcome back to members of the jury. The record will reflect the presence of counsel, as well as Mr. Fort and Ms. Montague. The witness is on the stand, so, Mr. Muehleck, you may continue your questioning.

MR. MUEHLECK: Thank you, Your Honor.

Q (BY MR. MUEHLECK:) This next page indicates it's a passport amendment, Mr. Garbarino.
A Yes.
Q What is this? Can you explain, please, what's happening here?
A This is an amendment to correct a mistake. Oftentimes a mistake could be made on a passport application where your passport is printed with an incorrect name or incorrect date of birth. And it looks like the passport was printed using the last name of Palmrose, P-a-l-m-r-o-s-e. You can see that down at the bottom, those are the two double slashes. And that this applicant filed to have their passport corrected to Walter Glenn Primrose, P-r-i-m-r-o-s-e. The double slashes mean we still clear that name. Even though it was an incorrect name, we want to clear it to make sure, again, through our name check system to make sure there's no wants, warrants, child support is not owed, anything along those lines.
Q Slide down again. It says "Please amend"?
A "Please amend to correct last name, signature per attached application."
Q Please go down and scroll down.
And there's a letter.
A Yes, there's -- would you like me to read it?
Q Yeah, just -- well, I think so everybody can see, it

will take a moment.

A Says --

Q This is the National Passport Center in Pittsburgh. Why Pittsburgh?

A Well, it is technically just -- the National Passport Center is in Portsmouth, New Hampshire; however, as I said earlier, all of the passport applications go to -- it was a one single address in Pittsburgh, Pennsylvania, at that time.

Then that agency would then direct those applications to the appropriate passport agency or center.

So this is in regards to an incorrect name on a recently issued passport. The passport we received, the last name was spelled incorrectly and the original passport was enclosed with the erroneous one.

Q Please go on to the -- stop right there. Enlarge that around that.

See the photo, Mr. Garbarino?

A Yes.

Q Okay. And this person indicates that -- all right. And this is in the name of Walter Primrose, you see 3-30-99?

A Yes.

Q Okay. Go down a little bit. And he -- I'm sorry. It's up above him.

He indicates here that there's a previous passport?

A Yes.

Q HG930146 --
A Yes.
Q -- issued in April 28th, 1987?
A Yes.
Q All right. Take a look at that photo again, please. This is Walter Primrose. How does that compare to the photo in Exhibit 7 for Bobby Edward Fort in a passport in 1996?
THE COURT: All right. The document speaks for itself. The jury can look at that. He's not an expert in identifying people. So move on.
Q (BY MR. MUEHLECK:) If -- then if this person is the same person, wouldn't this person, Walter Glenn Primrose, have to report that there may have -- there was a book issued for him in the name of Bobby Edward Fort?
A Yes.
Q Okay. Let's go to the 19- -- anymore on this? No, 1996. Let's go back to Exhibit 7 and the 1996 passport in Kodiak -- I'm sorry -- the 2016 passport in Kodiak, Alaska.
You talked about a passport that was issued with a mailing address of Kodiak, Alaska.
A Yes.
Q Keep going down. Keep going down, please, once more. Once more, Dennis? Keep going. Keep going. Right here.
THE COURT: What's the question?

Q (BY MR. MUEHLECK:) Did you open up a fraud investigation based on this passport, sir?

A Yes.

Q Why?

A Our office was conducting a audit of previously-issued passport applications, and we came upon this application because it had a late-issued social security number.

Q Explain, please.

A Generally social security numbers are issued for anyone born before 1990. Your social security number is generally issued around age 15; that's generally when you get your first job and you need to start paying taxes to the federal government. It would be odd for a person born in 1967 to have a late-issued social security, meaning it was issued after the age of 18, meaning that they never had to work, or had to take out loans, pay taxes. So that is what -- so that is why it was referred to my office.

Q And what did you do?

A At that point we conducted additional research on that identity.

Q Please explain.

A We used some databases in our office, some are private, some are public databases, online databases to see if we could find any additional information on Bobby Edward Fort,

and we came across a death certificate for Bobby Edward Fort.
Q You remember what year was the death?
A I believe it was 1967, yes.
Q And, okay. So what did that mean to you possibly?
A That this person was using the identity of a deceased infant.
Q An imposter case?
A Yes.
Q Did you look -- did you open up a corresponding investigation based upon Bobby Edward Fort?
A Yes.
Q What'd you do -- what did you do? What other investigation, please?
A Part of the standard protocols when we are conducting our research is to conduct that exact same research on any names or associates of the individual, and he had left -- Bobby Edward Fort had left Julie Lyn Montague as his emergency contact on a number of his previous passport applications.
Q Did you look at the Julie L. Montague?
A Yes.
Q What did you look for there?
A We also found that a social security number was issued late, after the age of 18. Through our database research, we found death certificates for Julie Lyn Montague.

Q What was done then?
A At that point we determined that Julie Lyn Montague had also obtained the identity of a deceased infant, and we referred both Bobby Edward Fort and Julie Lyn Montague to a Diplomatic Security to conduct further investigation.
Q A criminal investigation?
A Yes.
Q Was that done?
A Yes.
MR. MUEHLECK: Exhibit -- Exhibit 12, please. Offer Exhibit 12 into evidence?
THE COURT: All right. Any objection?
MR. PRIMROSE: No objection, Your Honor.
THE COURT: Ms. Montague?
MS. MORRISON: No, Your Honor.
THE COURT: Received. You may publish.
MR. MUEHLECK: Thank you. Please publish.
(Exhibit 12 received into evidence.)
Q (BY MR. MUEHLECK:) Next page.
We talked before just previously on the 199- -- 1997 application -- excuse me -- the 1999 application for Walter Primrose and that he listed a previous passport and you read the number off, Mr. Garbarino.
A Yes.
Q Is that number on this passport?

A Yes.
Q It's the -- what? -- the perforated one at the top?
A The perforated one at the top and you can also see that the applicant would have written it in the passport number which is HG930146.
Q And lists the bearer's address as 111 Finley in Lufkin, Texas?
A Correct.
Q Next page, please. Move up, please.
This is a passport that's issued 1987?
A Yes.
Q Expires on 1997?
A Yes.
Q And is marked "Cancelled"?
A Yes.
Q Please explain.
A Anytime you apply for a new passport application and you submit your previous passport, it is cancelled and returned. That's where you'll see C and R on an application, so cancelled and returned. And then the new passport is issued. It should be stamped on that exact same date and then that new passport will be sent to you in the mail.
Q What about the old passport?
A That passport would also be returned to you in the mail.

Q And if it was undeliverable?
A It would be sent back to the issuing agency.
Q Where did Exhibit 12 come from, Mr. Garbarino?
A It came from a box of exemplars that were used to train acceptance agents, those folks that accept passport applications at U.S. Post Offices, your library, your town clerk's office. Our office is in charge of training those folks in our region. We used exemplars, meaning old passport applications, to show them what old passports looked like throughout the course of the issuance of a passport.
So essentially it's an exemplar which was with a number of other exemplars used to train acceptance agents on what passports look like throughout the years.
Q This was found as a training aid at the National Passport Center?
A Correct.
Q Do we have it here? Okay.
Have you examined it? You seen it, sir?
A Yes.
Q Is it legitimate?
A Yes.
Q An authentic passport?
A Yes.
MR. MUEHLECK: May I approach the witness, Your Honor?

THE COURT: For purposes of what?

MR. MUEHLECK: Well, if he wanted to see the original, Judge.

THE COURT: Why would he want to see the original?

MR. MUEHLECK: If there was any question about that.

THE COURT: Do you want to ask him if he wants to see the original?

MR. MUEHLECK: No, I'll move on, Your Honor.

THE COURT: Okay. Thank you.

MR. MUEHLECK: Pass -- I'd like to show a couple other exhibits, Your Honor.

THE COURT: You may.

MR. MUEHLECK: Exhibit 14, please.

THE COURT: Any objection, Mr. Fort?

MR. PRIMROSE: No objection, Your Honor.

THE COURT: Ms. Montague?

MS. MORRISON: No objection.

THE COURT: All right. It's received in evidence.

(Exhibit 14 received into evidence.)

MR. MUEHLECK: Publish, please, Your Honor?

THE COURT: You may.

Q (BY MR. MUEHLECK:) Can you see Exhibit 14, sir?

A Yes.

Q Next page, please.

Does this appear to be a legitimate passport?

A Yes.

MR. MUEHLECK: Exhibit 15, Your Honor, we would offer.

THE COURT: 15?

MR. MUEHLECK: 15.

THE COURT: Any objection?

MR. MUEHLECK: Next exhibit.

MR. PRIMROSE: No objection, Your Honor.

THE COURT: Ms. Montague?

MS. MORRISON: No objection.

THE COURT: All right. Received. You may publish.

MR. MUEHLECK: Publish, please, Your Honor.

THE COURT: Yes.

(Exhibit 15 received into evidence.)

Q (BY MR. MUEHLECK:) Next page, please. Next page, please. Is this a legitimate passport, Mr. Garbarino?

A Yes.

MR. MUEHLECK: Exhibit 220, please -- I'm sorry. Exhibit 20, please.

THE COURT: All right. Any objection to Exhibit 20?

MR. PRIMROSE: No objection, Your Honor.

MS. MORRISON: No objection.

THE COURT: All right. Received. You may publish.

MR. MUEHLECK: Thank you, Your Honor.

(Exhibit 20 received into evidence.)

Q (BY MR. MUEHLECK:) Take a look at Exhibit 20, please. And the next page and the next page.

Appear to be a legitimate U.S. passport, Mr. Garbarino?

A Yes.

MR. MUEHLECK: Pass the witness, Your Honor. Thank you.

THE COURT: Mr. Fort, do you have any questions?

MR. PRIMROSE: Yes, Your Honor, I do.

THE COURT: All right. Your witness.

MR. PRIMROSE: Oh, thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PRIMROSE:

Q I didn't have in my notes, how long have you been working on this case, sir?

A Since 2020.

Q 2020. I had 2020 and 2016, so we'll stick with 2020.

Do you have the particulars, you have intimate knowledge of this case in respect to passports?

A Yes.

Q From the -- from the very beginning?

A Yes.

Q What is the earliest passport that was issued to Walter Glenn Primrose? I am going to -- from what is presented this morning, it was the HG930146; is that correct? Is that

the earliest passport you have on file?
A Yes.
Q You said that there was extra documentation, whenever the passport photo -- I'm sorry. A passport application goes to the passport agency. There could be extra documentation case work, say -- you said warrants or child support or child alimony; is that correct?
A No.
Q Would you please -- that's what I had written down that you had, and there could be the possibility that you would have a file with an application?
A It wouldn't be a file. There are -- there are electronic checks that are done up front before that passport is accepted.
Q And that would hold that information?
A Yes.
Q Are you aware of any information having to do with passport No. HG930146? Is there any other external information having to do with that? Are you -- that is --
A I'm not aware.
Q That you are unaware of any other information other than the application and the passport itself and it ended up being a -- an exemplar as a training aid?
A Yes.
Q I have one last question that I didn't quite

understand. At one point you said, alluding that, if I got the term correctly, an imposter case. What's the difference between an imposter and somebody that has an identity fraud?

A An imposter is somebody who generally has taken over the identity of someone else that they don't have a rightful claim to that identity. So that would be imposter fraud.

Q So it's essentially the same thing but different -- I'm sorry. I was not understanding. So --

A I don't understand the question.

Q Is there a difference between imposter fraud and identity fraud, simply put?

A Yes.

Q Would you explain, please?

A As I said earlier, imposter fraud would be when someone is -- has taken the identity of another person.

Identity fraud could be considered -- could be conducted by the person who has a rightful claim to that identity but maybe they've changed some of that information, meaning their name or their date of birth.

Q Okay. Final question, when you said that earlier, you alluded that there would be an exchange or a place or a business that you could buy that sort of information; that correct?

A I don't recall saying that.

MR. PRIMROSE: I'll have to stop there. I rest for

questions.

THE COURT: All right. Thank you.

Ms. Montague, any questions?

MS. MORRISON: Yes, Judge.

CROSS-EXAMINATION

BY MS. MORRISON:

Q I'm -- just a moment. What is his name?

Mr. Garbarino, I'm sorry, I was looking for your name. I couldn't remember it. Did you submit any reports to the government regarding this case?

A Yes.

Q What dates did you -- do you know what dates you submitted this?

A I believe my initial report was submitted in February of 2020.

Q Okay. Was that your only report that you submitted to the government? Was that --

A There had been some follow-up information that had been requested by Diplomatic Security, but my official report came in February of 2020.

Q So it was all given to Diplomatic Security or just the follow-up?

A It was all given to Diplomatic Security.

MS. MORRISON: All right. Thank you, sir. No further questions.

THE COURT: All right. Any redirect?

MR. MUEHLECK: No, Your Honor. Thank you.

THE COURT: All right. You're excused as a witness. Please don't discuss this case with anyone or your testimony until after the trial's completed. You're released from your subpoena and you can leave the state of Hawaii. Thank you very much. Good day, sir.

MR. MUEHLECK: Call our next witness, Your Honor?

THE COURT: Please.

MR. MUEHLECK: Scott Stalla.

THE COURT: Thank you.

Please administer the oath to the witness.

THE COURTROOM MANAGER: Thank you, Your Honor.

**SCOTT JUSTIN STALLA, GOVERNMENT'S WITNESS, WAS SWORN**

THE COURTROOM MANAGER: Thank you. Please be seated.

If you'd state your full name and spell your last name for the record.

THE WITNESS: My name is Scott Justin Stalla. The spelling of my last name is S-t-a-l-l-a.

THE COURT: Your witness.

DIRECT EXAMINATION

BY MR. MUEHLECK:

Q Mr. Stalla, are you employed?

A Yes, sir.

Q How are you employed?
A I'm a special agent with the U.S. Department of State Diplomatic Security Service.
Q How long have you been a special agent with DSS?
A About 15 years.
Q Where are you stationed, sir?
A I'm currently in the Washington, D.C. area, suburb called Dunn Loring, Virginia.
Q What are your duties there?
A I work in our Antiterrorism Assistance Program.
Q And where before Washington, D.C. were you employed as a DSS agent?
A In our Washington -- sorry -- our Houston field office.
Q Let me direct you to February 13th of 2020. Do you know if you were working at the Houston office that day?
A I was.
Q What were your duties that day? Did you have an assignment?
A I did. I investigated passport fraud.
Q And did you have a particular action you took on that day?
A I did. I received a lead request -- a lead request is essentially a request for information -- to locate the burial locations of two individuals.

Q Okay. Let me stop and ask -- back up one question.
A Sure.
Q What's the mission of DSS? What are Diplomatic Security Service agents? What do they do?
A So the DSS has primary three responsibilities, three missions is to investigate passport fraud, visa fraud, and corresponding identity theft. We protect the Secretary of State, we also protect U.S. embassies and consulates overseas.
Q All right. Back to the Houston assignment on February 13th of 2020, you were investigating what? Individuals?
A Correct. I was requested to locate the burial location of two individuals.
Q What were those -- the names of those two individuals?
A Bobby E. Fort and Julie Lyn Montague.
Q Okay. And did you go to a particular location?
A I did. I went to two locations.
Q Which was the first one you went to?
A The first location was a city cemetery in Marshall, Texas.
Q And how were you able to -- what -- how did you get to the city cemetery? Did you check out something before or what?
A I did. I drove from our Houston field office to

Marble Falls, it's around 220 miles away, and I stopped at the Parks and Recreation Office in Marble Falls.

Q Did you speak with an individual there?

A I did.

Q What was his name?

A Lewis Fincher.

Q Okay. And did you make a request of Mr. Fincher?

A I did. I asked him to review his records to see where this burial location was located in the city cemetery.

Q Okay. And was that for a Bobby Edward Fort?

A Yes, sir.

Q Did Mr. Fincher assist you?

A He did. He -- after we reviewed the records, we walked to the city cemetery which is about 500 yards from his office to where the burial location is.

Q Were you able to locate something of interest?

A I was. We were able to locate the burial location based off his records and identified a tombstone, essentially.

Q Can we look at Exhibit 6.1, please?

6.1, do you recognize this photo, sir?

A Yes, sir. I took this photo.

Q Okay. And this is -- this is in Marble Falls, Texas?

A It is, in the city cemetery.

Q And offer -- does it accurately depict the Bobby

Fort area?
A It does.
MR. MUEHLECK: Offer 6.1 into evidence, Your Honor.
THE COURT: Any objection?
MR. PRIMROSE: No objection, Your Honor.
MS. MORRISON: No objections.
THE COURT: Received. You may publish.
MR. MUEHLECK: Publish, please, yes.
(Exhibit 6.1 received into evidence.)
Q (BY MR. MUEHLECK:) Next exhibit, please, 6.2, please, Kari.
Recognize this exhibit, sir?
A I do. I took this photo as well.
Q You took this photo?
A Yes, sir.
Q All right. Does it accurately depict the Fort headstone for Clarence E. and Gwendolyn Fort?
A Yes, sir.
Q On that day, February 13th, 2020?
A Correct. I took the photo as well.
MR. MUEHLECK: Offer the exhibit, Your Honor.
THE COURT: Any objection?
MR. PRIMROSE: No objection, Your Honor.
MS. MORRISON: No, Your Honor.
THE COURT: Received. You may publish.

(Exhibit 6.2 received into evidence.)
MR. MUEHLECK: 6.3 show to the witness, please, Your Honor.
Q (BY MR. MUEHLECK:) Does -- did you take this photo, sir?
A I did.
Q Of the Gwendolyn side of the Fort tombstone?
A Yes, sir.
Q Does it accurately depict the tombstone on that day, February 13th, 2020?
A Yes. Yes, sir. I took this photo as well.
MR. MUEHLECK: Offer the exhibit, Your Honor.
THE COURT: Any objections?
MR. PRIMROSE: No objection, Your Honor.
MS. MORRISON: No objection.
THE COURT: All right. Received. You may publish.
(Exhibit 6.3 received into evidence.)
MR. MUEHLECK: Please.
Q (BY MR. MUEHLECK:) Okay. All right. 6.4 to the witness. Did you take this photo?
A Yes, sir.
Q Does this depict the Clarence side of the tombstone --
A Yes.
Q -- on that day?

A Yes, sir.

Q February 13th, 2020?

A Yes, sir.

MR. MUEHLECK: Offer 6.4, Your Honor.

THE COURT: All right. Any objection?

MR. PRIMROSE: No, no objection, Your Honor.

MS. MORRISON: No, Your Honor.

THE COURT: All right. Received. You may publish.

(Exhibit 6.4 received into evidence.)

Q (BY MR. MUEHLECK:) Is there -- was there -- yes. Thank you, Your Honor.

I want to look for a minute, then I've got a question, follow-up question.

Was there a Bobby Edward Fort headstone?

A No, sir.

Q Where did you -- where did you go after Marble Falls?

A Barnet, Texas.

Q How far is that?

A Around 15 miles.

Q And you drove by car, your vehicle?

A Yes, sir, I drove by my government vehicle as well.

Q What's that area like? Is it rural? Metropolitan? Or what's it like?

A It's very rural. Texas is a big state. It's a lot

of distance between each town. There's not a lot of cities and towns in between.

Q What were you looking for at Burnet?

A I was looking for the burial location as well for Julie Lyn Montague.

Q And how did you go about? Were you successful in finding a spot?

A I was.

Q How did you do that?

A I started my search when I arrived at the city, I went to the city hall, and I asked to see their records to help me identify the location of the burial plot.

Q And were you able to find a burial spot?

A I was.

MR. MUEHLECK: Exhibit 3, I believe admitted, already admitted, to the witness.

THE COURTROOM MANAGER: It is.

Q (BY MR. MUEHLECK:) Exhibit 3, sir, recognize that?

A I do. I took this photo.

Q On that same day?

A Same day.

MR. MUEHLECK: Your Honor, we pass the witness -- or we could publish this again, if we could, please, so they know what we're talking about?

THE COURT: You may. Exhibit 3 is in evidence.

MR. MUEHLECK: It's in evidence?

THE COURT: Yes.

MR. MUEHLECK: Thank you.

THE COURT: All right. Thank you. We'll take that down now.

Mr. Fort, any questions?

MR. PRIMROSE: Yes, Your Honor.

THE COURT: Your witness.

MR. PRIMROSE: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PRIMROSE:

Q Since we have this pulled up or we just got through with the --

THE COURT: Did you want the exhibit?

MR. PRIMROSE: Yes, please.

THE COURT: The last one showed?

MR. PRIMROSE: Yes, please, Exhibit 3, please.

THE COURT: Exhibit 3, all right, will be published to the jury and the witness. Thank you.

Q (BY MR. PRIMROSE:) With respect to identity fraud, you had to go to a location to have them pull up the records to find -- to find a person identified with that. Like, for example, for identity fraud if you were walking by this particular gravesite, what information would be picked up in order to make a driver's license or a passport? Could you tell

me that, sir?

A Sir, could you repeat the question, sir?

Q From my understanding when identity fraud happens, you go to a graveyard and you walk through it until you find a baby that you want to steal the information. How would you find that from what's pulled up on Exhibit No. 3?

A Well, I can't speak to every individual who steals an identity, sir, but oftentimes people do steal identity of deceased individuals. You could ascertain that information from a death record, an obituary in the newspaper, and you could use a gravestone. I think there's a variety of ways to do it.

Q So on this particular one we have it looks like 1968. So I would go to a newspaper and then just spend the next couple of months looking for a -- looking for a death -- a death notice, which may or may not even be in this state; is that correct?

A Oftentimes people publish obituaries, sometimes they do not.

Q So according to the prosecutor, this occurred like 20 years after -- after the fact of this person -- this supposed person happens to be buried. So we wouldn't have any idea how to determine from this particular gravestone or tombstone any date or even any family having to identify with it; is that correct?

A The tombstone doesn't have the family's name or the exact date of death.

Q How would that be determined? You're the expert on identity fraud and imposter fraud. How would we do that?

A So, again, there's a variety of ways that people could steal an identity. They could ascertain or collect records from numerous sources, government sources, newspapers, stealing mail. There's a wide variety of ways that you could get the biographical information of individuals to steal their identity.

Q So that means in this particular case for this particular tombstone, you don't have any idea how it was done; is that correct?

A Is your -- so I don't know exactly how this identity was stolen, no.

Q Okay. That's a satisfactory answer.

Could we pull up the one for the Forts? I think that was -- was that Exhibit 15; is that correct?

THE COURT: You talking about the gravestone?

MR. PRIMROSE: Yes, yes, Your Honor, yes.

THE COURT: I believe that's 6.2.

MR. PRIMROSE: That's 6.2? I'm sorry, 6.2.

THE COURT: Is that the one you want?

MR. PRIMROSE: Yes, Your Honor. This will be fine, Your Honor.

THE COURT: All right. 6.2 will be published. What's your question?

Q (BY MR. PRIMROSE:) Okay. Sir, same with this one. This is a Fort gravestone and has --

THE COURT: So the document speaks for itself. He took the picture.

MR. PRIMROSE: Yes.

THE COURT: So what's your question about this exhibit?

Q (BY MR. PRIMROSE:) My question is how could we determine that there is another -- another person having to do with this gravestone? 'Cause what I understand that there is not a gravestone for Bobby Edward Fort; is that correct?

A That's correct. There is no gravestone for Bobby Fort.

Q So a person could walk through that graveyard looking for a child 20 years prior, that would be impossible from this gravestone or this -- this -- this gravesite?

A Well, as I mentioned, there's not a gravestone at this cemetery for this individual.

Q That would be picked up from records unknown, and you cannot give me -- the DSS cannot give me -- or cannot supply the information to this Court as to how that would be done other than generalities; is that correct?

A Can you rephrase your question, please?

Q From your pictures that you took in the graveyard, you cannot -- phrase my question.
From your presence in the graveyard, would you be able to tell how the -- that there was a child that was buried there by walking by, from what I understand.
A Correct. So walking by, no. The city records indicate, yes.
Q It's a very good observation. Where are the city records kept for this particular -- for this particular graveyard?
A The city records are kept in the city's database, which I was able to review with this particular case the park superintendent.
MR. PRIMROSE: Very good. Do we have -- I remember seeing that myself, Your Honor. I don't know whether that screenshot is in the exhibit. May I ask the prosecutor whether it's in our exhibits?
THE COURT: The death certificate, you mean?
MR. PRIMROSE: No, Your Honor. There's a screenshot of this particular cemetery. Do we have that in exhibits? Or --
THE COURT: Of the entire cemetery, you mean?
MR. PRIMROSE: Yes, Your Honor. Yes, Your Honor. Or is --
THE COURT: Well, if you want -- you want to enter

it into evidence, then you identify the exhibit. So you have to identify the exhibit.

MR. PRIMROSE: I believe that -- well, procedural thing. I believe that we have a copy of it in our exhibit.

THE COURT: So that you can identify the exhibit number.

MR. PRIMROSE: And we could put it in now; would that be correct?

THE COURT: Exactly.

MR. PRIMROSE: Oh, very good.

THE COURT: What's the exhibit number?

MR. PRIMROSE: Ms. Kau, what is the exhibit -- she's working on it.

THE COURT: Okay.

MR. PRIMROSE: Sorry, little surprise there. He brought out a piece --

THE COURT: No, don't -- you just need to ask questions. Okay.

Do you have the exhibit?

MR. PRIMROSE: We're still looking --

THE COURT: All right. Mr. Fort, what is the exhibit of? Just of the cemetery?

MR. PRIMROSE: The exhibit is -- what the gentleman offered is there is a computer --

THE COURT: What is the exhibit of?

MR. PRIMROSE: It's of the -- a total exhibit of the graveyard. It has --

THE COURT: A photo of the graveyard. So what's the relevance?

MR. PRIMROSE: No, it is a digital representation, and on the top it would have the name of the people that are in there and it will say whether there's a marker or not.

THE COURT: All right. So what is the relevance? We have the gravestone. It does not have Bobby Edward Fort's name on it. So you want to prove that there's a marker that has Bobby Edward Fort?

MR. PRIMROSE: Yes. My proof would be that --

THE COURT: Why do you want -- what's the relevance? Explain to me the relevance of the document you're going to want to introduce.

MR. PRIMROSE: The relevance is when you go into the --

THE COURT: Cemetery.

MR. PRIMROSE: -- the cemetery --

THE COURT: Yes.

MR. PRIMROSE: -- you don't see anything. But when you go to the hall of records and you pull this up on the computer, the information is not listed there either. And then --

THE COURT: All right. So there's no relevance.

I'm not going to allow you to go into that.

All right. What's your next question? There's no relevance 'cause he's not on the gravestone, either.

MR. PRIMROSE: The next relevance is that --

THE COURT: What's the next question?

Q (BY MR. PRIMROSE:) Prior to the 1990s, there weren't any computers like this that have that particular information. Where else would that be derived from for that graveyard, if someone was going to walk by that graveyard?

A So again, there's -- in this particular photograph there's not a headstone for Bobby E. Fort. To access the records of where somebody might be in that cemetery, you would have to check with the city.

Q Okay. So there wouldn't be any way to do it from this picture.

Yes, that is the one that I want.

THE COURT: What's your next question? Are you done with this witness?

Q I'm done with -- thank you, Your Honor.

THE COURT: All right. Thank you.

Ms. Montague, do you have any questions?

MS. MORRISON: Yes, Your Honor.

CROSS-EXAMINATION

BY MS. MORRISON:

Q Mr. Stalla, what would someone typically look for in

seeking an identity to take over, that being the identity of a deceased small child?

A Well, there's a number of reasons why one -- somebody would want to steal a identity. They may be concealing their own identity. They may be concealing their international movements. They may want to commit a -- an additional crime of some sort that you need someone else's identity to use.

And again, to acquire someone's identity, there's numerous methods. You could use social engineering, for example. I think a lot of people are victims of identity theft from sometimes themselves or relatives just willingly giving information either on the telephone through some sort of scam, or a mailer. Again, people could collect people's mail. Mail theft is often associated with identity theft itself. There's numerous methods to obtain someone's identity fraudulently.

Q Okay. Thank you, sir. Did social engineering exist in 1987?

A Social engineering has always existed in one form.

Q Could you define social engineering to me? Because I really do not know what that is.

A Social engineering is a way to elicit information from someone. You may ask a question that may be meaningless, but it means something very much to somebody else, meaning they'll ask you about what your favorite hobby is, what your

family likes to do, but really what they're doing is gathering little bits of information along the way to create a whole picture of who you may be as a person, when your birthday might be, where you may have celebrated your birthday.

And social engineering is essentially that process of collecting little bits of information to paint a whole picture of an individual.

Q So that would be not necessarily a computer-related thing?

A Correct. That's what -- that's exactly the definition, so social engineering. It's not a technical way of gathering information; it's a social method of getting information.

Q Very good. Thank you. And how would you go about that in 1987? Would it be the mail method, just, you know, stealing people's mail? Just walking up and chatting to random people? How would that work?

A I can't speak to the method of everyone who steals identity of another individual, but again, social engineering may have been a practice that someone would want to use to collect other people's information. Could be mail theft, it could be combing through obituaries. It could be really gaining any information that exists in the public domain.

Q All right. Can you be -- you cannot be more specific, I assume?

THE COURT: I think he's answered the question.

MS. MORRISON: All right, I'm sorry. I will move on.

THE COURT: Thank you.

Q (BY MS. MORRISON:) So since the grave of Bobby Fort was not marked, I assume that could not be a method of stealing identity in this case; is that correct?

A Are you specifically saying the method of walking into a regular --

Q Yes.

A That's correct.

Q Very good. Sir, I think I just have a little bit more to go. Did you submit any reports to the government regarding this case?

A I did.

Q About what dates would you know of that you might have submitted this?

A I don't have the report in front of me, but it would have been in the month of -- I took this action on February the 13th, 2020. I would have filed that report within that same month.

Q Excellent. And would that be just the one report or would you have had follow-up reports, any other reports?

A No, that was my sole report in this case.

Q And to whom would the reports have gone?

A The normal method for any report that we do, it'll go to our supervisor, supervisor will clear, make sure it's accurate, and if he doesn't have -- if he or she doesn't have any questions, he will send it to the case agent.

Q Okay. And then what would the case agent do with it or would -- or what entity would the case agent be with?

A So the case agent is also a special agent within the same office as me under Diplomatic Security, and what they do with it is sort of up to them, the next stage of the investigation.

MS. MORRISON: Very good, sir. So you would not know there. Very good.

Those are all my questions, Your Honor. Thank you.

THE COURT: All right. Any redirect, Mr. Muehleck?

MR. MUEHLECK: No redirect, Your Honor. Thank you.

THE COURT: All right. Thank you, sir. Please don't discuss your testimony with anyone till the case is over, and you are excused from your subpoena and as a witness and you may leave the state. Thank you very much. Good day to you.

THE WITNESS: Thank you, ma'am.

THE COURT: Your next witness.

MR. MUEHLECK: Lacey Dingman, Your Honor.

THE COURT: Thank you.

MR. MUEHLECK: Thank you, Agent Stalla.

THE COURT: Please administer the oath.

THE COURTROOM MANAGER: Thank you, Your Honor.

**LACEY DINGMAN, GOVERNMENT'S WITNESS, WAS SWORN**

THE COURTROOM MANAGER: Thank you. Please be seated.

If you'd state your full name and spell your last name for the record.

THE WITNESS: Sure. Lacey Dingman, D-i-n-g-m-a-n.

THE COURT: Your witness, Mr. Muehleck.

MR. MUEHLECK: Thank you.

DIRECT EXAMINATION

BY MR. MUEHLECK:

Q Are you employed?

A Yes, sir.

Q How are you employed?

A I'm employed with the City of Marshall in Texas.

Q In what capacity?

A Sure. I'm the Director of Parks and Recreation for the city and we maintain parks, recreation programs, and then we -- part of that we manage the cemetery.

Q The cemeteries?

A Yes, sir.

Q How long have you had that job?

A I started December 2019.

Q Do you know a gentleman by the name of Lewis Finster?

A Fincher, yes, sir.
Q How do you know him?
A He was a previous employee for the City of Marble Falls. He worked as a parks superintendent.
Q Was he involved in the cemetery's administration?
A Yes, sir.
Q Okay. Exhibit 6, let's go Exhibit 6, please.
The Marble Falls Parks and Recreation have records of the cemeteries?
A Yes, sir.
Q Maps of the cemeteries?
A Yes, sir.
Q Let's look at Exhibit 6, please. If you can see that and tell me if you recognize this item?
A I do.
MR. MUEHLECK: Offer the exhibit, Your Honor?
THE COURT: Any objection?
MR. PRIMROSE: No, Your Honor, no objection.
MS. MORRISON: No, Your Honor.
THE COURT: All right. Received. You may publish.
MR. MUEHLECK: Publish, please.
(Exhibit 6 received into evidence.)
MR. MUEHLECK: May I from my chair, Your Honor?
THE COURT: You may.
MR. MUEHLECK: Thank you.

Q (BY MR. MUEHLECK:) Ms. Dingman, what is the first page of Exhibit 6?

A You want me to describe what this is showing?

Q Yes. The first page should be a map, perhaps?

A Yes. So this is a overview of our map system. It's digitized of our cemetery and you can see the information that comes up in that box is just the detail information that relates to that plot, that it is -- it's over, it's got highlighted.

Q And then you've got a centerpiece that shows -- we can go into that a little bit, Kari. Yeah, thank you -- "030225: Fort, Bobby E." What is this?

A So cemeteries are plotted, so that's a unique plot identifier. The first two digits are what we call our garden, so it's the larger section, so it tells me it's in garden 3. It tells me this plot is on row 2, so the second row from the road, and then it's the 25th plot.

Q So we're only on the second row in from the road?

A Correct, in that Term 3.

Q And the plot 25 is the burial plot?

A Yes, it's the -- it's the number and it's -- I believe in this section it is numbered from left to right.

Q Okay. And it's for the interment of an individual named?

A Sure. So every plot in the cemetery is actually

plotted, and this one is actually showing that somebody's actually buried there because it is color coded.

So the brown indicates there's an actual burial there. People also buy plots pre-dying and they prepare for those -- make those preparations ahead of time. So once they do that, they're reserved in their number as well and their name as well.

Q Planning ahead?

A Yes.

Q Okay. And is Bobby Edward Fort here interred at the cemetery according to this record?

A According to this record, yes, and all the records that I've viewed shows that he is buried and he is the only one buried there in that particular plot.

Q Single --

A Single marked.

Q What does that mean?

A So certain plots could be prepared for their double, meaning there could be two people buried on top of one another. This one in fact was single and unmarked means that there is no grave marker.

Q No headstone?

A Correct.

Q Is that a common practice?

A Yeah. Unfortunately it wasn't until 2014 that we

even passed by ordinance that they had a requirement to make -- to put a headstone when somebody was interred, and so there are several places in our cemetery that are unmarked.

Q And there seems to be an arrow on the left border of this box, white arrow. What does that signify?

A It just means that it's highlighting that plot that's got a little bit of a teal outline to it, it just means that it's attached to that reference.

Q That's where Bobby Edward Fort is interred?

A Correct, correct.

Q Next page. Okay. Can you go in on that and see what we've got? Okay. And go ahead, please?

A Yeah. So this is just a zoomed-in version of our interactive map that shows a little bit more information, has the longitude and latitude of that location, of that plot.

Q Your records are digitized?

A They are. They were digitized in 2017.

Q Next page. What does this show, please?

A So this is a zoomed-out version so you can just see how the -- all the garden section's physical layout, and so you can see that he is in garden 3 and just how it physically is located in our cemetery.

Q The big block is garden 3?

A Yes.

Q The big gray block marked 3?

A Yes, sir.
Q Next page down at the bottom.
A Would you like me to explain --
Q Please.
A Sure. So previously to now the way we've modernized our record keeping, records for the cemetery used to be kept in a card catalog file, kind of like you would remember the old library files, and they're cross-referenced.
And so the top one is showing the plot being owned by CE Fort, but the lower smaller index card was filed when the body was interred for Bobby Fort.
Q 1967?
A Correct.
Q How many cemeteries do you administer in Marble Falls?
A Just one.
Q Are there other cemeteries in Marble Falls?
A No other municipal cemeteries. I'm not aware if there's any other privately owned/managed. I can't think of one.
MR. MUEHLECK: Pass the witness, Your Honor. Thank you.
THE COURT: Mr. Fort, any questions?
MR. PRIMROSE: Yes, Your Honor. That is actually the exact representation that I wanted.

CROSS-EXAMINATION

BY MR. PRIMROSE:

Q Good afternoon. How many gravesites are there in the cemetery?

A I would not know.

Q 200? 300? 500?

A Probably thousands.

Q Thousands?

A Uh-huh.

Q Are -- this is an identity fraud case and we are --

THE COURT: So you can't make a statement. You have to ask a question of this witness that she would know something about.

Q (BY MR. PRIMROSE:) In 1987 how would someone go about finding out information in your cemetery of someone who was buried there that's not marked?

A I would -- I wouldn't know that. I could make some assumptions if you -- but I wouldn't know that firsthand. I would assume you could go look at death records at the courthouse. I would assume so. I could say that our system wasn't digitized until 2017.

Q So there wasn't -- there wouldn't be -- if someone was to come to you prior to 2017, how would they do that? Do you have an office or a --

A Sure, we do have an office and our cemetery records

because we're part of a municipal government all -- they're subject to open records request once those laws were passed. So you could request any kind of records. If it was relevant, we would give that to direct requester, or if it wasn't, we would refer to it the attorney general and ask for their decision on whether or not it was -- would meet the Open Records Act.

Q So someone would have to go through the Open Records Act more than likely --

A I -- I would assume so --

THE COURT: Okay. All right. She can only take one of you at a time. So you need to wait till he finishes answering the question --

THE WITNESS: Okay.

THE COURT: -- and then -- all right.

So ask your question again.

Q (BY MR. PRIMROSE:) The question is would someone have to go through the Open Records Act in order to get records for someone that's buried in your cemetery but is an unmarked?

A To date? Currently?

Q No, prior to 2017, 'cause we're talking about a case that was in 1987.

A I can't testify to what -- how staff would have handled a situation prior to 2017. What I can say is it's readily available information now that's been digitized. It's

open, it's on our city website. So you can search records now.

Prior to 2017 I wouldn't know how they went about any kind of request. I can speak that we tend to try to help people as best we can. If we can't -- if we don't feel like that it is a matter of public record, then we would put them -- we'd send them to our city secretary and ask them to handle the situation.

Q Two questions. The other one, you have hundreds of records, thousands of records, by paper?

A Well, so they've all been digitized, they're electronic. But, yes, we have backup, card catalogs, they're -- they're -- of records that were created prior to us digitizing, yes.

Q And one final question, has anyone for that particular website that you -- that -- has anyone for that particular gravesite asked questions like excavating it to make sure that there is a corpse there?

A Not that I'm aware.

MR. PRIMROSE: That's all my questions. Thank you, Your Honor.

THE COURT: All right. Ms. Montague, any questions?

MS. MORRISON: I have no questions, Your Honor.

THE COURT: Thank you. Any redirect?

MR. MUEHLECK: No redirect, Your Honor.

THE COURT: All right. Thank you.

MR. MUEHLECK: Thank you.

THE COURT: So I'm going to excuse you as a witness. Please don't discuss your testimony with anyone or allow anyone to discuss it with you. And you're released from your subpoena so you can leave the state of Hawaii. All right. Thank you very much. Have a good day.

THE WITNESS: Thank you.

THE COURT: Any other witnesses?

MR. MUEHLECK: I have one more, Your Honor.

THE COURT: Very good.

MR. MUEHLECK: Agent Shawn Gray.

Thank you, Ms. Dingman. Safe trip.

THE COURT: All right. Please administer the oath to the witness.

THE COURTROOM MANAGER: Thank you, Your Honor.

**SHAWN GRAY, GOVERNMENT'S WITNESS, WAS SWORN**

THE COURTROOM MANAGER: Thank you. Please be seated.

If you'd state your full name and spell your last name for the record.

THE WITNESS: Shawn Gray, last name G-r-a-y.

THE COURT: Your witness.

DIRECT EXAMINATION

BY MR. MUEHLECK:

Q Are you employed, sir?

A Yes.
Q How are you employed?
A I'm a special agent with the U.S. Department of State, Bureau of Diplomatic Security.
Q Assigned where?
A I'm the resident agent in charge of the Honolulu resident office.
Q How long have you been special agent with DSS?
A 14 going on 15 years.
Q How long have you been the resident agent at the Honolulu DSS office?
A Just started my third year.
Q Were you working on July 22nd of last year, 2022?
A Yes.
Q What were your duties that day?
A I was assigned as the arresting and transporting agent for the subject.
Q Who did you arrest?
A Walter Primrose.
Q Tell me what he's wearing, for the record?
A The white shirt over there with the glasses.
MR. MUEHLECK: May the record reflect the witness has identified the defendant, Walter Glenn Primrose?
THE COURT: It shall.
Q (BY MR. MUEHLECK:) Where was that arrest -- where

did that arrest take place?

A It was at the Coast Guard office at the Barbers Point.

Q Okay. Were there other agents there?

A Yeah. Yes.

Q One of your agents from the mainland?

A Uhm, yes, from Los Angeles.

Q I'm sorry. Go ahead, sir.

A From the Los Angeles field office.

Q Okay. You remember her name?

A Yeah, Rebecca Gillespie.

Q Was there evidence taken into -- collected at that time?

A Yes. When the subject was arrested, when we put him in handcuffs after the search, his belt, wedding ring, shoelaces, wallet, and keys were taken 'cause they can't be taken to the Federal Detention Center, and those were handed over to Rebecca to be processed.

Q As evidence?

A As evidence, correct.

Q Okay. Was that a low intensity arrest, no problems?

A Yeah, no issues.

Q Okay.

MR. MUEHLECK: A moment, please, Your Honor?

THE COURT: You may.

MR. MUEHLECK: Thank you.
Q (BY MR. MUEHLECK:) Were you working on August 23rd, sir, of this year?
A Yes.
Q And were you assisting Agent Thomas -- excuse me -- August 9th, excuse me, of this year?
A Yes.
Q Assisting Agent Thomas?
A Correct.
Q Okay. And was that in the discussion of a search warrant to obtain DNA, buccal swab from the defendant, Walter Primrose?
A Yes, sir.
Q Okay. And that was with a search warrant?
A Yes.
Q Did Agent Thomas have the search warrant?
A Yes, he did.
Q Did you meet with Mr. Primrose?
A Yes. We went to meet him in person.
Q Just did you meet with Mr. Primrose?
A Yes.
Q All right. And did Agent Thomas show him the warrant?
A Yes.
Q Was the warrant explained to the defendant --

A Yes.
Q -- Mr. Primrose?
A Yes.
Q Who did that?
A Agent Thomas did.
Q Okay. And did Agent Thomas explain that it was a court order to take a DNA sample by buccal swabs inside the cheek?
A Yes.
Q Did Agent Thomas explain that the warrant authorized the agents to use reasonable force?
A Yes, he did.
Q Did the defendant, Walter Primrose, comply or did he object and not give a sample of DNA?
A He objected.
Q And you chose not to use reasonable force for the purpose of not harming anyone?
A We did not proceed further.
MR. MUEHLECK: Pass the witness, Your Honor.
THE COURT: All right. Mr. Primrose -- Mr. Fort, any questions?
MR. PRIMROSE: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. PRIMROSE:
Q Just a second. I need to look for this particular

form.

I have a form from -- that was some DNA samples --

THE COURT: All right. Do you have an exhibit number?

MR. PRIMROSE: I do not have an exhibit number. May I --

THE COURT: So you can ask a question about it.

MR. PRIMROSE: Yes.

THE COURT: But you can't read from the document.

MR. PRIMROSE: Not read from the document.

Q (BY MR. PRIMROSE:) The witnesses that were on the mainland that got buccal swabs had to sign a consent form; is that correct?

A I don't know what witnesses you're talking about.

Q There are -- do you -- do you have intimate knowledge of this particular case?

A Well, I'm a supervisor of the case agent, if that's -- I don't know what intimate knowledge would entail.

Q That would be do you know who the witnesses are that would be -- that, for example, who might be a relative of my wife or relative of me? Do you have that knowledge?

A I mean, I have general knowledge of the case, but not --

Q You do not have intimate knowledge of this. Who does have intimate knowledge of this case?

A The case agent.
Q Who's the case agent?
A Dennis Thomas.
Q Dennis Thomas. That I needed that on the record that Dennis Thomas is not going to be testifying in this -- in this case --
MR. MUEHLECK: Well, I'm going to object. That's a statement rather than a question, Your Honor.
THE COURT: It is, yeah. So the jury is going to disregard that last comment, although comments of any -- Mr. Muehleck, Mr. Fort, or Ms. Montague are not evidence.
All right. Did you have a question for this witness, though?
Q (BY MR. PRIMROSE:) You are the -- you were the arresting agent for me; is that correct?
A Yes.
Q Do you know the procedures well for arresting a person very well? How often do you arrest people?
THE COURT: Okay. So which question do you want him to answer? The last one, how often does he arrest individuals?
MR. PRIMROSE: Yes, Your Honor.
Q (BY MR. PRIMROSE:) How often do you arrest people?
THE COURT: So --
THE WITNESS: We perform arrests in the various

duties of our job.

Q (BY MR. PRIMROSE:) How often? Once a week? Once a year? Once a month?

A Well, I mean, it depends on the position. When I'm stationed overseas I'm not arresting people, but when I'm based domestically, it's part of the duties.

Q So you cannot give me a guess -- can you guess how many people you have arrested within the past year?

A Just one. Just you in the past year.

Q And you have intimate knowledge on how to -- and do you have intimate knowledge on how to arrest someone, what is required, what the -- what the process is?

A Yes.

Q When someone is submitted to, like say, for example, the Federal Detention Center, you mentioned that certain items had to be taken from the arrestees; is that correct?

A Yes.

Q And you know what the items are that you -- would you repeat what the items were that were taken from me?

A Well, it was everything off your person 'cause it couldn't be taken with you to FDC, so it includes your wedding ring, your keys, includes belt, your shoelaces, and your wallet.

Q Do you know, sir, that wedding rings are allowed at Federal Detention Center Honolulu; it's a program statement?

Do you know that?
A I wasn't aware that. We just seized everything that was on your person and it would be dealt with later. It was returned to you at a later time.
Q It was not returned.
THE COURT: Okay. So you need to ask questions that have to do with this case. Okay. So ask your questions of this witness.
Q (BY MR. PRIMROSE:) So you do not know what the arrest procedures are; is that correct?
A I do know what the arrest procedures are.
THE COURT: Okay. So what's your question?
MR. PRIMROSE: I have no further questions.
THE COURT: Okay. Ms. Montague, do you have any questions?
MS. MORRISON: No questions.
THE COURT: All right. Do you have any redirect, Mr. Muehleck?
MR. MUEHLECK: Yes, I just have one item, Exhibit 143 to the witness. We would like to offer that, Your Honor.
THE COURT: All right. Any objection to Exhibit 143?
MR. PRIMROSE: No objection.
THE COURT: All right.

MS. MORRISON: No objection, Your Honor.

THE COURT: All right. Thank you. Then it's received. If you wish to publish, you may.

MR. MUEHLECK: Please.

(Exhibit 143 received into evidence.)

Q (BY MR. MUEHLECK:) Do you recognize this, Agent Gray, as the search warrant?

A Yes.

MR. MUEHLECK: I have no further evidence or no further questions for this witness and no further evidence to submit for this witness, Your Honor, other than this.

THE COURT: All right, sir. Okay. So this didn't come up in direct, so I'm going to allow you folks to cross on it if, you want. Do you have any questions about the warrant?

MR. PRIMROSE: Stand by, Your Honor.

No, Your Honor.

THE COURT: All right. Any questions about the warrant, Ms. Montague?

MS. MORRISON: Oh, no, ma'am.

THE COURT: All right, sir. Thank you. You're excused as a witness. Please don't discuss your testimony with anyone until after the case is concluded.

All right.

MR. MUEHLECK: No further witnesses today, Your Honor. I have housekeeping matter with the Court, if we have

the time.

THE COURT: All right. So, ladies and gentlemen, you're going to be excused from school early today. So please put your notebooks behind.

Let me remind you, of course, don't discuss the case with anyone or allow anyone to discuss it with you. Don't put anything on social media or Twitter about this. Don't do any research or investigate. And, of course, don't read, watch, or listen to any media accounts, should there be any.

On behalf of everyone here, I thank you for your service today.

Please rise for the jury. They are excused until 8:30 A.M. tomorrow morning.

(Open court without the jury.)

THE COURT: All right. The record will reflect that the jury is no longer present. Present are counsel, and Mr. Fort and Ms. Montague.

All right. So this concludes the first day of trial. I'm going to take up any matters now before we conclude for the day.

Mr. Muehleck, you had a matter you wanted to bring up?

MR. MUEHLECK: I just want -- I will give the defense the names of the witnesses tomorrow, but one of the witnesses that is going to -- we may not call and is available tomorrow is Catherine Crumpler from Wyoming. She leaves on a

flight Thursday. She's on the defense witness list. I discussed that briefly with the Court.

But I think the defense should be aware that they should call her tomorrow, if they're going to -- if they're going to ask questions. Certainly if we call her tomorrow, they'll do whatever they want with her after with the Court's permission, but they should be prepared to give their defense case with her tomorrow. And I'll give the names of the rest of the witnesses we intend to call, Your Honor.

We made, I should say, a good bit of progress today in some of the witnesses. Many of the witnesses at the end of the list, Your Honor, are chain of custody, links in the chain of custody on DNA evidence and stuff like that, so that's where we are, Judge. Thank you.

THE COURT: All right. Thank you very much.

Okay. So do you want to call that witness tomorrow?

MR. PRIMROSE: Yes, Your Honor, that's correct, we will.

THE COURT: Okay. So --

MR. MUEHLECK: We will have her here tomorrow, Your Honor.

MR. PRIMROSE: Thank you.

THE COURT: So what order do you want to do this? Do you want to take her -- so she's leaving Friday?

MS. MORRISON: Thursday.

MR. MUEHLECK: Thursday night I think at 7:00 P.M. with a flight, Judge.
THE COURT: Okay. So shall we put her up first?
MR. MUEHLECK: That's fine.
THE COURT: All right. First witness --
MR. PRIMROSE: Thank you, Your Honor.
THE COURT: -- tomorrow morning, and I will instruct the jury that you were calling her, but because she resides on the mainland and her travel flights, that we're calling her out of order.
So you folks will be questioning her first. Mr. Muehleck will then have an opportunity to cross-examine, and then you'll have an opportunity for redirect.
MR. PRIMROSE: Very good. Thank you, Your Honor.
THE COURT: So whatever exhibits you want to put in through her, you need to prepare tonight or have it available --
MR. PRIMROSE: Okay. Thank you, Your Honor.
THE COURT: -- during your questioning.
And then, Mr. Muehleck, after she's off the stand, will then proceed with his witnesses for tomorrow, which he will advise you in short time.
MR. MUEHLECK: Understood. Thank you, Your Honor.
THE COURT: Okay. Anything that we need to address for you folks today before we end today?

MR. PRIMROSE: No, Your Honor.

MS. MORRISON: No thank you, Your Honor.

THE COURT: All right. All right. Very good then.

Mr. Fort and Ms. Montague are remanded back to the custody of the U.S. Marshals Service, and we'll see you folks tomorrow morning for trial, and we'll start with the defense's first witness.

All right. Thank you very much. We stand adjourned for the day.

(Proceedings adjourned at 1:32 P.M., until Wednesday, October 25, 2023, at 8:30 A.M.)

COURT REPORTER'S CERTIFICATE

I, DEBRA READ, Official Court Reporter, United States District Court, District of Hawaii, do hereby certify that pursuant to 28 U.S.C. §753 the foregoing is a complete, true, and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

DATED at Honolulu, Hawaii, October 24, 2023.

*/s/ Debra Read*

DEBRA READ, CSR CRR RMR RDR